[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-11432

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 27, 2012
JOHN LEY
CLERK

D.C. Docket No. 1:08-cr-20574-JAL-5


UNITED STATES OF AMERICA,

                                                            Plaintiff - Appellee,

versus

RALPH MERRILL,

                                                            Defendant - Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 27, 2012)

Before TJOFLAT, PRYOR and RIPPLE,* Circuit Judges.

PRYOR, Circuit Judge:

_____

*Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting
by designation.

When Ralph Merrill sold millions of rounds of ammunition to the United States Army, he concealed that the ammunition was manufactured by a Communist Chinese military company because his contract with the Army prohibited the delivery of that kind of ammunition. He even went so far as to have the ammunition repackaged, which made it unsafe for later use. Merrill was convicted for conspiracy to commit false statements, major fraud, and wire fraud against the United States, 18 U.S.C. § 371, and for major fraud and wire fraud, 18 U.S.C. §§ 1031, 1343, 2. On appeal, Merrill argues that the district court misinterpreted the regulation that prohibits the Department of Defense from acquiring munitions manufactured by a Communist Chinese military company, that the regulation does not apply to the ammunition he sold, and that he did not defraud the government because he did not misrepresent a material fact when he lied about the origin of the ammunition. Merrill's argument fails because his interpretation of the statute is flawed and, more fundamentally, is irrelevant to his misconduct. Merrill also argues that his convictions should be overturned because the district court excluded evidence of purported government knowledge about the origin of the ammunition, denied his motion to suppress, denied his motion to compel the government to produce handwritten notes from investigators, admitted a redacted version of a suppression hearing transcript, and refused to direct the

government to grant immunity to a witness. Merrill also contends that the government did not produce sufficient evidence to support his convictions for major fraud and wire fraud. Because all of Merrill's arguments fail, we affirm his convictions.

## I. BACKGROUND

We divide our discussion of the background of this appeal into two parts. We first discuss the facts that led to Merrill's arrest. We then review the procedural history of this appeal.

### A. Conduct That Led to Merrill's Arrest

In August 2006, the United States Army solicited a bid from AEY, a munitions dealership based in Miami Beach, Florida, for a contract to supply the Afghanistan Security Forces with various types of military munitions including nearly 500 million rounds of AK-47 ammunition. Ralph Merrill, an investor in AEY, was heavily involved in the operations of the company. Merrill advised AEY about how to prepare its bid, inquired with his contacts in the arms business about prices of the ammunition to be supplied under the contract, and attested to the Army that AEY had experience performing this type of contract. When the Army requested further details about the financial viability of AEY, Merrill provided letters on behalf of two of his companies that promised to loan a total of

3

$36 million to AEY in support of the contract. Merrill and Efraim Diveroli, the president of AEY, agreed that they would split the profits from the Afghan contract evenly. AEY submitted a final bid price of $298 million, and the Army awarded it the contract.

The contract provided that for two years AEY would supply certain ammunition to the Afghan National Police and the Afghan National Army as needed. The contract required AEY to certify that each shipment of ammunition was serviceable and conformed to the requirements of the contract. A specific question on the certificate of conformance asked where the ammunition was manufactured.

The contract expressly incorporated a Defense Federal Acquisition Regulation Supplement clause that provided that "[a]ny supplies or services covered by the United States Munitions List that are delivered under this contract may not be acquired, directly or indirectly, from a Communist Chinese military company." 48 C.F.R. § 252.225-7007. This prohibition was included in the e-mail that AEY forwarded to Merrill to notify him that AEY had won the contract. David Packouz, a vice-president at AEY, testified that the prohibition is "widely known in the arms industry."

The main supplier that AEY used to fill its orders was MEICO, an Albanian

4

munitions dealership.  When Alexander Podrizki of AEY arrived in Albania to oversee shipping operations, he noticed Chinese characters on the wooden crates containing the ammunition and notified Diveroli and Packouz.  Packouz was nervous because he knew that AEY could not deliver Chinese ammunition, that MEICO accounted for approximately 95 percent of the ammunition covered by the first two Afghan orders, and that AEY was already late in delivering the ammunition.

Merrill, Diveroli, and Packouz discussed whether the Chinese ammunition might be legal because it had been acquired by MEICO in the 1960s and 1970s, before the United States had enacted an arms embargo against China.  They decided that Diveroli should ask the State Department if AEY could legally sell the ammunition to the Army.  They chose not to ask the Army if it would accept the Chinese ammunition because if the Army said "no," AEY would have a "big problem."  They decided not to seek ammunition from another source because those efforts would further delay already overdue deliveries.  Merrill, Diveroli, and Packouz agreed that, if the State Department informed them that the arms could not be sold legally, they would repackage the ammunition to eliminate the Chinese characters and ship it.  On April 23, 2007, Diveroli asked the Directorate of Defense Trade Controls Response Team at the State Department in an e-mail if

it was legal to broker "Chinese Ammunition that has been sitting for about 20 years with a company in Albania." The same day, the State Department replied that "US policy . . . would not authorize the transaction. Exceptions to this policy require a presidential determination."

On April 25, 2007, Merrill sent an e-mail to Packouz and Diveroli that contained photographs that showed how to remove the Chinese characters from the wooden crates with scraping tools. When they discovered that the tins that held the ammunition also had Chinese characters, they decided that they would paint the tins to cover the writing. They then discovered that the hermetically-sealed tins contained paper inside that bore Chinese characters. Although removing the papers required them to destroy the vacuum seal, which could make the ammunition unsafe for the battlefield, Packouz, Merrill, and Diveroli decided to open the tins, remove the paper, and repackage the ammunition in cardboard boxes.

By June 2007, AEY began shipping the repackaged ammunition to Afghanistan. Packouz testified that AEY sent at least 30 certificates of conformance to Afghanistan that contained the false statement that the manufacturer of the ammunition was MEICO, not the Communist Chinese military companies that had actually manufactured the ammunition. In October 2007, an

investigator from the Department of Defense and an agent from the United States Department of Immigration and Customs Enforcement traveled to Albania to investigate AEY. At the airport hangar where AEY operated, the investigators found piles of empty ammunition tins with Chinese characters, pallets marked with "AEY" and the Afghanistan contract number that were loaded with boxes of loose ammunition, and white burlap sacks filled with brown paper wrappings from the ammunition and ammunition data placards with Chinese characters.

In January 2008, Agent Albert Wiesner of the United States Army Criminal Investigations Command visited an ammunition depot outside of Kabul to investigate AEY. A supervisor at the storage facility identified the containers that held AEY ammunition. Wiesner obtained random samples of ammunition from the containers and photographed the containers, pallets, cardboard boxes, and ammunition. The boxes lacked the identifying ammunition data cards that boxes of ammunition ordinarily contain. Wiesner traveled back to Bagram Air Base with the samples and shipped them to the United States. Two experts analyzed the samples and concluded that they were manufactured in China.

In April 2008, Defense Criminal Investigative Services Special Agent Luis Perez traveled to Utah to serve Merrill with grand jury subpoenas seeking documents related to AEY and the Afghanistan contract. The investigators then

were unaware that Merrill was involved in criminal activity with AEY. While Perez was in Utah, Merrill told him that he was only a financier for AEY. Merrill also told Perez that he knew that it was illegal to buy or sell Chinese ammunition because of the embargo.

Merrill arrived in Miami on May 6, 2008, to prepare for his grand jury testimony. The next day, he voluntarily met with Assistant United States Attorney James Koukios, Agent Perez, Special Agent Ferdinand Vazquez of the U.S. Army Criminal Investigation Division, and an agent of Immigration and Customs Enforcement. Merrill asserted that he first learned the Chinese origin of the ammunition in August 2007 when a search warrant was executed on AEY. He stated that he had not had any communication with Diveroli about concealing the Chinese characters on the crates and tins. When confronted with e-mails to Diveroli about that subject, Merrill first denied, but then admitted, that he had written the e-mails. Koukios then advised Merrill that the interview had reached a new level and explained that Merrill had the right to leave, to obtain counsel, or to stay and talk about the e-mails. Koukios informed Merrill that he could likely face charges. Koukios explained that if Merrill cooperated, the government could ask for a reduction in Merrill's sentence, and if he pleaded guilty, the government would recommend leniency, but discussions of leniency were general in nature.

Merrill stayed and talked to Koukios and the agents and returned voluntarily after a lunch break for further discussions.  Merrill told them that he had learned about the Chinese origin of the ammunition in April 2007 from phone calls and e-mails with Diveroli.  He admitted that when he and Diveroli realized that they would not receive clearance to ship the Chinese ammunition, they agreed that AEY would conceal the origin of the ammunition and continue to ship it.  They were now, in Merrill's words, playing a game of "high-stakes poker."

*B. Procedural History*

A federal grand jury returned a superseding indictment that charged Merrill with one count of conspiring to commit offenses against the United States by (a) making material false and fraudulent statements in a matter within the jurisdiction of the Department of the Army, 18 U.S.C. § 1001(a)(2); (b) executing a scheme to defraud the United States and the Army and to obtain money by means of material false and fraudulent representations in the procurement of property valued at $1,000,000 or more as a prime contractor with the United States, 18 U.S.C. § 1031; and (c) using wire communications for the purpose of executing the scheme  to defraud, 18 U.S.C. § 1343.  The indictment also charged Merrill with thirty-five counts of major fraud against the United States for knowingly executing a scheme and attempting to execute a scheme to defraud the United States and the

9

Army, and to obtain money by means of material false and fraudulent representations in the procurement of property valued at $1,000,000 or more as a prime contractor with the United States, 18 U.S.C. §§ 2, 1031; and thirteen counts of wire fraud for using wire communications for the purpose of executing a scheme to defraud the United States and the Army, 18 U.S.C. § 1343.

Before trial, Merrill argued that the indictment should be dismissed because the sale of the Chinese ammunition acquired from MEICO was not prohibited under the arms embargo passed by Congress in 2006 or the Department of Defense regulations that implemented the statute. He contended that the regulation did not apply because MEICO had acquired the ammunition from Communist China forty years before AEY acquired it from MEICO and no contract or subcontract with a Communist Chinese military company existed. The district court denied Merrill's motions, United States v. AEY, Inc., 603 F. Supp. 2d 1363 (S.D. Fla. 2009), and denied a later motion to reconsider its order.

Merrill also argued that the charges against him should be dismissed because the government knew that the ammunition was manufactured by a Communist Chinese military company before it accepted the ammunition. He sought to introduce evidence to support defenses of public authority, entrapment by estoppel, and innocent intent. The district court excluded this evidence because

10

Merrill never alleged that he knew that any government official knew about the Chinese origin of the ammunition when AEY was shipping the ammunition. The district court ruled that any alleged government knowledge was irrelevant to Merrill's proposed defenses because it could not have affected Merrill's specific intent. The court also ruled that the origin of the ammunition was a material fact for purposes of fraud, even if the government knew the origin of the ammunition.

Merrill filed a pretrial motion to suppress statements he made at the May 2008 interview he attended with Koukios, Perez, and Vasquez in preparation for his grand jury testimony. He argued that the statements were made during plea negotiations and that the government abused its grand jury subpoena power to force Merrill to engage in the interview. After an evidentiary hearing, the magistrate judge recommended that the district court deny Merrill's suppression motion. The district court denied Merrill's motion.

Merrill also filed a motion to compel the production of the agents' handwritten notes from the May 2008 meeting. The magistrate judge denied the motion to compel without prejudice. During the first trial, and in between the first and second trials, Merrill renewed his motion to compel the production of the agents' handwritten interview notes. Each time the district court examined in camera the agents' handwritten notes and the agents' typewritten report of the

11

interview with Merrill, which had been provided to Merrill. The district court determined that there were no contradictions between the notes and the report and that there was no exculpatory information in the agents' handwritten notes. The court also determined that nothing in the notes constituted material covered by the Jencks Act. The district court denied Merrill's motion. Merrill's first trial ended in a mistrial when the jury could not reach a verdict.

At Merrill's second trial, Packouz and David Black, another AEY employee, testified that AEY attempted to conceal the true origin of the ammunition that it sold to the Army, and Packouz testified that Merrill was involved in that scheme. Agents Vasquez and Perez testified about the admissions that Merrill made to them about his involvement in the fraud. The government presented over 150 e-mails that Merrill either sent or received that had to do with the Army contract. One e-mail from Merrill to Diveroli and Packouz contained images that showed how to remove markings from wooden crates of ammunition. Jerry Miller, a firearm and tool mark examiner with the United States Army Criminal Investigation Laboratory, examined the samples obtained by Agent Wiesner in Kabul. He offered expert testimony that the ammunition provided by AEY was manufactured in China. Dr. Tai Ming Cheung, an expert in the Chinese defense industry, testified that the photographs and ammunition samples obtained

12

by Agent Wiesner showed that the ammunition shipped by AEY into Kabul was manufactured by Communist Chinese military companies.

Merrill called Daniel Doudnik, a former employee of AEY, as a witness and the government noted that Doudnik, an unindicted co-conspirator in the AEY prosecution, might incriminate himself. Doudnik was appointed counsel and invoked his Fifth Amendment privilege against self-incrimination. Merrill argued that the district court should force the government to grant immunity to Doudnik or dismiss Merrill's indictment with prejudice because two of the witnesses for the government, Packouz and Black, were co-conspirators who were granted immunity. Merrill also argued that because the government had granted Doudnik direct use immunity for statements he gave during an earlier interview, Doudnik could be compelled to testify about those statements. The district court denied Merrill's motion. Merrill then sought to admit a report of an interview between Doudnik and Agent Perez as a statement against Doudnik's interest. The district court examined the report that Agent Perez had prepared and ruled that it was not admissible because it did not contain a statement by Doudnik against his interest.

Merrill testified at trial that he sent Diveroli an e-mail that showed how to remove markings from wooden crates so AEY could remove any sign that the crates held ammunition, which would reduce security threats to the crates. During

13

cross-examination, the government asked Merrill whether he recalled ever giving a different explanation for the purpose of the e-mail. Merrill said that he did not, and the government impeached him with testimony he had given at a suppression hearing. The government introduced a redacted transcript of Merrill's suppression hearing testimony, and Merrill objected on the ground that it was redacted and allegedly taken out of context. At the conclusion of Merrill's testimony, the district court heard arguments about the redacted transcript and ruled that it was admissible.

At the conclusion of the trial, the jury found Merrill guilty of one count of conspiracy to commit false statements, major fraud, and wire fraud, 18 U.S.C. § 371. The jury also convicted Merrill of twenty-one substantive counts of major fraud and eleven counts of wire fraud, 18 U.S.C. §§ 1031, 1343, and 2. The jury found Merrill not guilty on the remaining fourteen counts of major fraud and two counts of wire fraud.

## II. STANDARDS OF REVIEW

Several standards govern our review of this appeal. We review the interpretation of a statute de novo. United States v. Pistone, 177 F.3d 957, 958 (11th Cir. 1999). We review the evidentiary rulings of the district court for abuse of discretion. United States v. Walker, 59 F.3d 1196, 1198 (11th Cir. 1995). The

14

denial of a motion to suppress presents a mixed question of fact and law. United States v. Delancy, 502 F.3d 1297, 1304 (11th Cir. 2007). We review the findings of fact for clear error and the interpretation and application of law de novo. Id. We review the findings of fact related to the Jencks Act for clear error. United States v. Schier, 438 F.3d 1104, 1107 (11th Cir. 2006). We review the sufficiency of the evidence de novo, with all reasonable inferences and credibility evaluations resolved in favor of the verdict of the jury. United States v. Medina, 485 F.3d 1291, 1296 (11th Cir. 2007).

### III. DISCUSSION

Merrill raises eight arguments on appeal. First, he argues that the regulation that prohibits the Department of Defense from acquiring ammunition manufactured by a Communist Chinese military company does not cover the ammunition that AEY sold to the Army and that AEY did not misrepresent a material fact when it concealed the true origin of its ammunition. Second, Merrill argues that the district court abused its discretion when it excluded evidence of purported government knowledge about the Chinese origin of ammunition delivered by AEY. Third, he contends that the district court erred when it denied his motion to suppress statements he made to a prosecutor and federal agents during an interview. Fourth, he argues that the government improperly used a

15

grand jury subpoena to compel his attendance at an interview with a prosecutor. Fifth, he argues that the district court abused its discretion by failing to require the government to produce handwritten notes that investigators produced during an unrecorded interview with Merrill. Sixth, he argues that district court abused its discretion by admitting a redacted version of a suppression hearing transcript. Seventh, Merrill argues that the district court abused its discretion when it refused to direct the government to grant Daniel Doudnik immunity for his proposed testimony. Finally, Merrill contends that the government did not produce sufficient evidence to support his convictions for major fraud and wire fraud. These arguments fail. We address each argument in turn.

*A. The District Court Correctly Ruled That AEY Was Prohibited from Selling Communist Chinese Ammunition.*

Merrill argues that the regulation that prohibits the Department of Defense from acquiring munitions manufactured by a Communist Chinese military company did not apply to the ammunition that AEY sold to the United States Army because the Albanian company that sold the ammunition to AEY did not acquire the ammunition from China in contemplation of fulfilling a contract with the Department of Defense. Merrill argues that, because the Department of Defense regulation does not apply to the ammunition that AEY sold, the origin of

16

the ammunition was not a material fact, and Merrill could not have defrauded the government by concealing the origin of the ammunition. Section 1211 of the National Defense Authorization Act for Fiscal Year 2006 provides that "[t]he Secretary of Defense may not procure goods or services . . . through a contract or any subcontract (at any tier) under a contract, from any Communist Chinese military company." Pub. L.109-163 § 1211, 119 Stat. 3461 (Jan. 6, 2006). To implement this rule, the Department of Defense amended the Defense Federal Acquisition Regulation Supplement to state as follows: "Do not acquire supplies or services covered by the United States Munitions List (USML) (22 CFR part 121), through a contract or subcontract at any tier, from any Communist Chinese military company." 48 C.F.R. § 225.770-2. The regulation requires every solicitation and contract that involves the delivery of covered munitions to include a clause that provides that "[a]ny supplies or services covered by the United States Munitions List that are delivered under this contract may not be acquired, directly or indirectly, from a Communist Chinese military company." 48 C.F.R. § 252.225-7007. This clause was included in the solicitation for bids by the Army and the contract between AEY and the Army.

Merrill argues that the language "through a contract or subcontract at any tier" limits the reach of the embargo to those instances when a party obtains

17

ammunition from a Communist Chinese military company for the purpose of fulfilling a contract with the Department of Defense. He argues that, because his supplier, MEICO, did not acquire the ammunition from China for the purpose of fulfilling a contract with the Department of Defense, AEY did not violate any regulations when it purchased the ammunition and sold it to the Department of Defense.

Merrill's argument fails. The regulation states that the Department of Defense may not "acquire supplies . . ., through a contract or subcontract at any tier, from any Communist Chinese military company." 48 C.F.R. § 225.770-2. Although the regulation contains several explicit exceptions, 48 C.F.R. §§ 225.770-2–3, it does not contain any exception for munitions that left China before the rule was enacted. The rule requires that every solicitation and contract contain a clause that makes clear that munitions "delivered under this contract may not be acquired, directly or indirectly, from a Communist Chinese military company." 48 C.F.R. § 252.225-7007. The phrase "directly or indirectly" makes clear that the prohibition covers any ammunition manufactured by a Communist Chinese military company. Merrill's interpretation ignores the phrase "directly or indirectly" and would eviscerate the regulation. Under Merrill's reading, as long as munitions were sent from China to a third party before a Department of Defense

contract was contemplated, they could later be sold to the Department of Defense. Congress and the Department of Defense could not have intended to include such a gaping loophole in their embargo.

But there is an even more fundamental reason why Merrill's argument is wrong: that is, even if the Defense regulation did not cover the ammunition that AEY shipped to the Army, Merrill still engaged in fraud. To establish that Merrill participated in "a scheme or artifice to defraud," the government needed to prove only "a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." United States v. Bradley, 644 F.3d 1213, 1238 (11th Cir. 2011). The contract that AEY signed explicitly prohibited the delivery of ammunition "acquired, directly or indirectly, from a Communist Chinese military company." Merrill and his co-conspirators at AEY knew that the Army would not accept their Chinese ammunition, so AEY misrepresented that their ammunition was manufactured in Albania. This misrepresentation was material because "it ha[d] a natural tendency to influence, or [wa]s capable of influencing, the decision maker to whom it [wa]s addressed." Id. at 1239.

*B. The District Court Did Not Abuse Its Discretion When It Excluded Evidence of Purported Knowledge of the Chinese Origin of the Ammunition.*

Merrill contends that the district court abused its discretion when it excluded evidence that purported to show that the government knew that AEY was delivering ammunition acquired by a Communist Chinese military company. He argues that, if the government knew the origin of the ammunition, it would be impossible for Merrill to defraud the government because he could not conceal from the government what it already knew. Merrill's argument fails.

Merrill sought to introduce evidence of government knowledge to establish the defenses of actual public authority, entrapment by estoppel, or innocent intent. Each of these defenses required Merrill to "show that he relied on official government communications before acting in a manner proscribed by law." United States v. Johnson, 139 F.3d 1359, 1365 (11th Cir. 1998); see also, United States v. Baptista-Rodriguez, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994). Merrill never alleged that he knew about or relied on any government approval when he committed his crimes. He alleged only that he later learned that the government knew the true origin of the ammunition when he lied to the Army. Accordingly, the district court did not err when it excluded Merrill's evidence as irrelevant. See Johnson, 139 F.3d at 1365.

Merrill argues that the evidence of purported government knowledge is still relevant because he could not conceal from the government what it already knew,

20

but we disagree. At bottom, Merrill contends that, for the purposes of a fraud conviction, a lie is only a lie if it works. But "a false statement can be material even if the decision maker actually knew or should have known that the statement was false." United States v. Neder, 197 F.3d 1122, 1129 (11th Cir. 1999).

*C. The District Court Did Not Err When It Denied Merrill's Motion to Suppress.*

Merrill contends that his statements to Assistant United States Attorney Koukios during meetings on May 7 and 8, 2008, should have been suppressed. He argues that he had a reasonable belief that he was engaged in plea negotiations. We disagree.

A court cannot admit against a defendant "a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea." Fed. R. Evid. 410(a)(4). To determine whether a discussion should be characterized as a plea negotiation the trial court must "determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances." United States v. Robertson, 582 F.2d 1356, 1366 (5th Cir. 1978).

The magistrate judge found that, even if Merrill had a subjective expectation

21

to negotiate a plea, his expectation was unreasonable. The magistrate judge stated that, at the time of the interview, Merrill had no charges pending against him. He was free to end the interview or to consult with his attorney, and he declined to do either even though he was advised of his rights. The magistrate judge credited the testimony of Agents Vasquez and Perez who testified that any discussions of leniency were general in nature and that no specific promises were made. The district court affirmed these findings.

No error occurred. There were no pending charges against Merrill when the discussion occurred, and the general discussions of leniency did not transform Merrill's meeting with the prosecutor and federal agents into plea negotiations. See, e.g., United States v. Cross, 638 F.2d 1375, 1380 (5th Cir. Mar. 1981); United States v. Posey, 611 F.2d 1389, 1390–91 (5th Cir. 1980) (The "statement that [the agent] would bring [the defendant]'s cooperation to the attention of the prosecutor and the court did not give [the defendant] a reasonable expectation that he was negotiating a bargain. Rather it is the antithesis of a bargained plea.").

*D. The Government Did Not Misuse a Grand Jury Subpoena To Interview Merrill.*

Merrill's argument that the government misused its subpoena power because the government arranged for Merrill to be in Miami two days before his grand jury testimony instead of immediately before his testimony fails. The

additional time allowed for a meeting between Merrill and Assistant United States Attorney Koukios at which Merrill admitted his role in the AEY fraud. The grand jury subpoena power may not be used by the United States Attorney's Office as part of its own investigative process. United States v. Elliott, 849 F.2d 554, 557 (11th Cir. 1988). But "the United States Attorney is allowed considerable leeway in attempting to prepare for a grand jury investigation" and "must regularly interview witnesses prior to appearances before the grand jury to ensure that grand jurors are not burdened with duplicate information." Id. at 556–57. The district court did not clearly err when it found no evidence that the government misused its subpoena power and denied Merrill's motion to suppress.

*E. The District Court Did Not Abuse Its Discretion When It Denied Merrill's Motion to Compel the Government to Produce Handwritten Notes by Agents Vazquez and Perez.*

Merrill contends that the district court abused its discretion when it denied his motion to compel the government to produce the notes taken by Agents Perez and Vazquez during their interviews with Merrill. He argues that their notes are subject to production under the Jencks Act, 18 U.S.C. § 3500, which has been incorporated into Federal Rule of Criminal Procedure 26.2. Merrill's argument fails.

When a party calls a witness, the party who did not call the witness is

23

entitled to receive "any statement of the witness . . . that relates to the subject matter of the witness's testimony" and that is in the possession of the party that called the witness. Fed. R. Crim. P. 26.2(a). A witness's "statement" is defined as follows:

> (1) a written statement that the witness makes and signs, or otherwise adopts or approves; (2) a substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in any recording or any transcription of a recording; or (3) the witness's statement to a grand jury, however taken or recorded, or a transcription of such a statement.

Fed. R. Crim. P. 26.2(f). "'[S]tatement,' under the Act, is a term of art; 'Congress[, in enacting the Jencks legislation,] was concerned that only those statements which [can] properly be called the witness'[s] own words should be made available to the defense.'" United States v. Jordan, 316 F.3d 1215, 1252 (11th Cir. 2003) (quoting Palermo v. United States, 360 U.S. 343, 352, 79 S. Ct. 1217, 1224 (1959)).

The district court did not abuse its discretion when it denied Merrill's motion. The notes that Merrill seeks from the agents were their accounts of Merrill's testimony, not transcriptions of Merrill's words. They are not "statements" under the Jencks Act.

*F. The District Court Did Not Abuse Its Discretion When It Admitted a Redacted Version of a Suppression Hearing Transcript.*

Merrill contends that the district court abused its discretion by admitting a redacted version of the suppression hearing transcript. Merrill alleges that the full transcript would show that Merrill was attempting to explain his answer to the prosecutor's question when the magistrate judge interrupted and instructed the prosecutor that his line of questioning was irrelevant. He argues that, because additional portions of the transcript were not admitted, his trial was unfair.

This argument has no support in the record. As the district court stated, there is nothing in the transcript to suggest that Merrill had not finished his answer or that he was interrupted. There are no dashes in the transcript to indicate an interruption. Merrill presents no evidence to establish that this ruling was an abuse of discretion.

*G. The District Court Did Not Abuse Its Discretion When It Denied Merrill's Motion to Compel the Government to Grant Daniel Doudnik Immunity for His Testimony.*

Merrill contends that the district court abused its discretion when it refused to compel the government to grant Daniel Doudnik immunity for his testimony because two of the witnesses for the government were co-conspirators who were granted immunity. He also argues that Doudnik should have been compelled to testify because Merrill sought to introduce at trial only statements that Doudnik

had provided to the government under an earlier agreement for direct use immunity. Finally, Merrill argues that because Doudnik was not forced to testify, his earlier statements to government agents should have been admitted as statements against interest. All of these arguments fail.

Merrill argues that we should follow a decision of the Ninth Circuit that ruled that, "in exceptional cases, the fact-finding process may be so distorted through the prosecution's decisions to grant immunity to its own witness while denying immunity to a witness with directly contradictory testimony that the defendant's due process right to a fair trial is violated," United States v. Straub, 538 F.3d 1147, 1166 (9th Cir. 2008), but that decision is inapplicable. In Straub, the prosecution granted immunity or benefits to eleven of its witness, but refused to grant use immunity to the only defense witness. Id. at 1152–53. In Merrill's case the government did not grant immunity to either of the co-conspirators who testified. Black was not heavily involved in the conspiracy and was never indicted, and Packouz pleaded guilty. Further, Merrill's argument is foreclosed by our precedent. We have held that "[f]ederal courts . . . have no authority to grant witnesses . . . use immunity. Congress has placed the power to grant use immunity exclusively in the Executive Branch." Grand Jury Proceedings (Williams) v. United States, 995 F.2d 1013, 1017 (11th Cir. 1993) (internal citations omitted).

26

The district court did not abuse its discretion when it denied Merrill's motion.

Merrill also argues that because Doudnik received direct-use immunity for statements he made at his interview with the government on April 8, 2008, immunity should have extended to his testimony regarding the same statements at trial, but this argument fails. The government agreed to grant Doudnik direct use immunity only for statements he made during the interview, not for any later statements regarding that information. Any statements by Doudnik at trial would not be covered by the agreement.

Finally, Merrill argues that statements that Doudnik gave to the government during his April 2008 interview should be admitted as statements against interest. See Fed. R. Evid. 804(b)(3). The district court held that the report was inadmissible. Merrill's argument fails.

The district court did not abuse its discretion by excluding this report. The report contained only three quotations. Two of the quotations were statements that Doudnik asserted were made by Diveroli. The district court was correct to exclude these statements as hearsay within hearsay. See Fed. R. Evid. 801. The third quote was Doudnik stating that Merrill was a "silent partner" in AEY. This statement was not against Doudnik's interest. See Fed. R. Evid. 804(b)(3).

*H. The Evidence Was Sufficient To Support Convictions for Major Fraud and*

*Wire Fraud.*

Merrill argues that the evidence presented at trial was insufficient to support the guilty verdicts for major fraud and wire fraud because the government did not establish a link between the ammunition that was produced at trial and the payments that were made by the Army to AEY, but the government presented overwhelming evidence of a connection between the ammunition and the contract between AEY and the Army. AEY employees Packouz and Black both testified that the AK-47 ammunition that AEY shipped to Afghanistan was manufactured by Communist Chinese military companies. Agent Wiesner testified as to how he identified and collected ammunition that AEY had shipped to Afghanistan. He shipped that ammunition back to the United States, and two experts analyzed the samples and concluded that they were manufactured in China. This evidence was more than sufficient to sustain a conviction for major fraud.

Merrill also argues that the wire fraud convictions were not supported by sufficient evidence because the government failed to produce evidence to establish that Merrill had access to any of the proceeds of the wire fraud, but the government had to establish only that Merrill participated in a scheme or artifice to defraud and used or caused the use of the wires for the purpose of executing the scheme. Bradley, 644 F.3d at 1238–39. The government did not have to prove

28

that Merrill had access to the proceeds of the fraudulent scheme. The government presented sufficient proof that the wires listed in the wire fraud counts were sent in furtherance of the fraudulent scheme in which Merrill was a knowing participant. This evidence is sufficient to sustain his convictions.

## IV. CONCLUSION

We affirm Merrill's convictions.

**AFFIRMED**.