[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-11576

_____

D.C. Docket Nos. 1:12-cv-20216-JAL,
1:08-cr-20574-JAL-2


EFRAIM DIVEROLI,
AEY, INC.,

Petitioners – Appellants,

versus

UNITED STATES OF AMERICA,

Respondent – Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 9, 2015)

Before MARCUS, WILLIAM PRYOR, and JILL PRYOR, Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

Efraim Diveroli's story is so outlandish that it has inspired an article in *Rolling Stone*, a book, and a forthcoming comedy film. *See* Guy Lawson, *How Two Stoner Kids from Miami Beach Became Big-Time Arms Dealers—Until the Pentagon Turned on Them*, Rolling Stone, Mar. 31, 2011, at 52; Guy Lawson, *Arms and the Dudes: How Three Stoners from Miami Beach Became the Most Unlikely Gunrunners in History* (2015); Borys Kit, *Jonah Hill to Star in Crime Comedy 'Arms and the Dudes,'* The Hollywood Reporter (Dec. 3, 2014, 4:56 PM), http://www.hollywoodreporter.com/news/jonah-hill-star-crime-comedy-753760. By age 21, Diveroli started his own company, became an international arms dealer, and won a $298 million contract with the United States Army to provide ammunition to Afghanistan. But his meteoric rise would not last. The contract prohibited Diveroli's company, AEY, from acquiring ammunition from Chinese manufacturers. When Diveroli learned that his primary supplier obtained its ammunition from China, he and his cohorts concealed the origin of the ammunition and falsely attested that it was from Albania. A grand jury indicted Diveroli, AEY, and his coconspirators on 85 counts of major fraud, wire fraud, and conspiracy to commit fraud. After Diveroli's attorney advised his client about the charges and estimated that he faced a sentence of 168 to 210 months if convicted, Diveroli

2

pleaded guilty to one count of conspiracy for which the district court sentenced him to 48 months of imprisonment.

Diveroli moved to vacate his sentence, 28 U.S.C. § 2255, on the ground that his attorney miscalculated his potential sentencing exposure, which Diveroli argues was only 70 to 87 months. Diveroli argues that he would have proceeded to trial but for his counsel's error. The district court denied his motion without an evidentiary hearing. Because the record establishes that Diveroli faced overwhelming evidence of guilt and had no viable defenses, we affirm.

## I. BACKGROUND

Diveroli was the president and owner of AEY, Inc., a Florida corporation that, from 2006 to 2007, was engaged in the business of procuring arms and ammunition. In January 2007, the United States Army Sustainment Command awarded AEY a contract worth $298 million to provide ammunition to the Islamic Republic of Afghanistan. The contract prohibited AEY from obtaining any ammunition "'directly or indirectly' from Communist Chinese military companies."

After Diveroli learned that AEY's Albanian supplier, Military Export and Import Company, obtained ammunition originally manufactured in China, he made the following inquiry to the United States Department of State: "We have been offered Chinese ammunition that has been sitting for about 20 years with a

3

company in Albania. Is it legal for us (as a US company) to broker this material?" The State Department replied, "U.S. policy, per part 126.1(a) of the [International Traffic in Arms Regulations] . . . would not authorize the transaction. Exceptions to the policy require a presidential determination." Diveroli then asked if there was any exception that would allow the sale of Chinese ammunition if it was stored in a friendly country for a sufficient period of time. The State Department responded, "[T]here is no way that the transaction which you propose could be so justified."

After receiving these emails, Diveroli and his cohorts decided to conceal the source of the ammunition. They first considered painting over the metal cases that had Chinese writing and scraping the Chinese markings off of the wood crates. They eventually decided to repackage the Chinese ammunition in cardboard boxes to conceal its source. AEY delivered approximately 35 shipments of Chinese ammunition in partial fulfillment of the contract, and the Army paid AEY over $10 million. The contract required AEY to attach a certificate of conformance to each shipment. In each certificate, Diveroli attested that the shipment conformed in all respects to the terms of the contract and identified Albania's Military Export and Import Company as the "Manufacturer (point of origin)."

When federal agents discovered the deception, AEY had already delivered $6.5 million worth of ammunition. The Army terminated the contract with AEY

and sustained costs of over $40,000 to reissue the contract to another supplier. AEY derived profits of approximately $360,000 from the sale of the nonconforming ammunition.

A grand jury indicted AEY and Diveroli on 85 and 84 counts respectively. The indictment charged AEY and Diveroli with 35 counts of making false statements to a federal agency, 18 U.S.C. § 1001(a)(2); 35 counts of major fraud against the United States, *id.* § 1031; and 13 counts of wire fraud, *id.* § 1343. The indictment charged AEY with an additional count of wire fraud. It also charged AEY and Diveroli with one count of conspiracy to commit the substantive offenses, *id.* § 371.

Diveroli and AEY, through Diveroli, pleaded guilty to conspiracy in exchange for the dismissal of the substantive counts. The parties agreed that the relevant loss amount for sentencing purposes was more than $400,000 and less than $1,000,001. *See* United States Sentencing Guidelines Manual § 2B1.1(b)(1). The plea agreement barred Diveroli and AEY from seeking a sentence below the guidelines range and from appealing their sentences or collaterally attacking their sentences under section 2255.

The presentence investigation report calculated a base offense level of 6, a 14-level increase for a loss amount more than $400,000 and less than $1,000,001, a

5

2-level increase because a substantial part of the fraudulent scheme was committed outside the United States, and a 4-level increase for Diveroli's role as a leader or organizer. The district court reduced the offense level by 2 for acceptance of responsibility. Diveroli's final offense level was 24, his criminal history category was I, and his guidelines range was 51 to 63 months, with a statutory maximum of 60 months, *see* 18 U.S.C. § 371.

The district court sentenced Diveroli to 48 months of imprisonment, followed by three years of supervised release, and it ordered him to pay restitution and a criminal fine. The district court sentenced AEY to two years of probation, a $500,000 criminal fine, and restitution.

Diveroli and AEY filed a motion to vacate their convictions and sentences, 28 U.S.C. § 2255. They argued that Diveroli's counsel had been ineffective under the Sixth Amendment because he miscalculated Diveroli's sentencing exposure. They alleged that Diveroli's counsel estimated his sentencing exposure to be 168 to 210 months, based on a loss amount of up to $30 million. They argued that this advice was erroneous because Diveroli's sentencing exposure at trial would have been 63 to 70 months under the correct loss amount. Diveroli and AEY alleged that had it not been for the incorrect advice, they would have proceeded to trial. They requested an evidentiary hearing on their claims. The district court denied the

6

motion, and we granted a certificate of appealability with respect to the following question: "Whether the district court erred in denying, without an evidentiary hearing, Diveroli's claim that his counsel rendered ineffective assistance by incorrectly advising him what his sentencing exposure would be if he proceeded to trial and was convicted."

## II. STANDARDS OF REVIEW

We review the denial of an evidentiary hearing for abuse of discretion. *Aron v. United States*, 291 F.3d 708, 714 n.5 (11th Cir. 2002). "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *Winthrop-Redin v. United States*, 767 F.3d 1210, 1215 (11th Cir. 2014) (quoting *Citizens for Police Accountability Political Comm. v. Browning*, 572 F.3d 1213, 1216–17 (11th Cir. 2009)) (internal quotation marks omitted). "When we review the denial of a motion to vacate, we review legal conclusions *de novo* and findings of fact for clear error." *Stoufflet v. United States*, 757 F.3d 1236, 1239 (11th Cir. 2014) (citation omitted).

## III. DISCUSSION

As an initial matter, we dismiss AEY from this appeal. The certificate of appealability does not mention the judgment of conviction and sentence against

7

AEY. And under section 2255, a movant must be "[a] prisoner in custody under sentence of a [federal] court." 28 U.S.C. § 2255(a). "Because a corporation cannot be held in custody, [it] cannot obtain relief under § 2255." *United States v. Rad-O-Lite of Philadelphia, Inc.*, 612 F.2d 740, 744 (3d Cir. 1979). AEY instead must file a petition for a writ of error coram nobis to challenge its conviction collaterally. *See id.*; *see also United States v. Morgan*, 346 U.S. 502, 511, 74 S. Ct. 247, 252 (1954) ("We do not think that the enactment of § 2255 is a bar to [a] motion [for writ of error coram nobis] . . . .").

Diveroli argues that his counsel's miscalculation of his sentencing exposure violated his right to effective counsel under the Sixth Amendment and that the district court should have granted him an evidentiary hearing to prove this claim. To prevail on his claim under the Sixth Amendment, Diveroli must establish that his "counsel's representation fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Hill v. Lockhart*, 474 U.S. 52, 57, 106 S. Ct. 366, 369 (1985) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 2065, 2068 (1984)) (internal quotation marks omitted). We assume without deciding that Diveroli's counsel miscalculated the

8

applicable guidelines range and that this error "fell below an objective standard of reasonableness." *Id.* (quoting *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064).

"In the context of guilty pleas, . . . the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 58–59, 106 S. Ct. at 370. "Moreover, to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372, 130 S. Ct. 1473, 1485 (2010). Diveroli argues that it would have been rational to go to trial on the defenses of literal truth and public authority, and he requests an evidentiary hearing to prove that his defenses were viable.

Diveroli makes two arguments. First, he argues that the district court abused its discretion by not granting an evidentiary hearing on his defenses of literal truth and public authority. Second, he argues that the district court used the wrong legal standard in denying his motion. We address each argument in turn.

A. *The District Court Did Not Abuse its Discretion in Denying an Evidentiary Hearing on Diveroli's Affirmative Defenses.*

Diveroli argues that he would have proceeded to trial on defenses of literal truth and public authority and that the district court should have granted an evidentiary hearing to evaluate the strength of those defenses. "[I]f the petitioner

9

'alleges facts that, if true, would entitle him to relief, then the district court should order an evidentiary hearing and rule on the merits of his claim.'" *Aron*, 291 F.3d at 714–15 (quoting *Holmes v. United States*, 876 F.2d 1545, 1552 (11th Cir.1989)). But "a district court need not hold a hearing if the allegations are 'patently frivolous,' 'based upon unsupported generalizations,' or 'affirmatively contradicted by the record.'" *Winthrop-Redin*, 767 F.3d at 1216 (quoting *Holmes*, 876 F.2d at 1553). Because both defenses were frivolous, the district court did not abuse its discretion by denying an evidentiary hearing.

## 1. Defense of Literal Truth

Diveroli argues that he would have gone to trial and asserted that the statements he made on the certificates of conformance were literally true. The district court ruled that the defense of literal truth would not have succeeded at trial and that Diveroli would not have insisted on going to trial on this defense. "To establish that [the defendant] participated in 'a scheme or artifice to defraud,' the government needed to prove only 'a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property.'" *United States v. Merrill*, 685 F.3d 1002, 1012 (11th Cir. 2012) (quoting *United States v. Bradley*, 644 F.3d 1213, 1238 (11th Cir. 2011)).

The United States identified two material misrepresentations made by Diveroli in each certificate of conformance. First, Diveroli falsely attested that the

10

shipments conformed to the terms of the contract. The contract incorporated the Prohibition on Acquisition of United States Munitions List Items from Communist Chinese Military Companies, which states, "Any supplies or services covered by the United States Munitions List that are delivered under this contract may not be acquired, directly or indirectly, from a Communist Chinese military company." 48 C.F.R. § 252.225-7007(b). Second, in the field for "Manufacturer (point of origin)," Diveroli falsely wrote Albania. Diveroli argues that "Manufacturer (point of origin)" could refer to either the place of manufacture or the point of shipment.

The district court did not abuse its discretion in refusing to conduct an evidentiary hearing. Overwhelming evidence established that Diveroli's answers on the certificates of conformance were false. This evidence included photographs of ammunition containers with Chinese markings, correspondence with the State Department admitting that the ammunition was manufactured in China, and internal emails discussing the best method of concealing the origin of the ammunition. Diveroli's defense of literal truth is "patently frivolous" and "affirmatively contradicted by the record." *Winthrop-Redin*, 767 F.3d at 1216 (quoting *Holmes*, 876 F.2d at 1553) (internal quotation marks omitted).

## 2.  Defense of Public Authority

Diveroli also argues that the district court abused its discretion by not granting an evidentiary hearing for his defense of public authority. To establish this

defense, Diveroli would have to prove that "he reasonably relied on the authority of a government official to engage him in a covert activity." *United States v. Baptista-Rodriguez,* 17 F.3d 1354, 1368 n.18 (11th Cir. 1994). And the official must have "in fact had the authority to empower the defendant to perform the acts in question. . . . [R]eliance on the *apparent* authority of a government official is not a defense in this circuit, because it is deemed a mistake of law, which generally does not excuse criminal conduct." *Id.*

The district court again did not abuse its discretion. Diveroli alleges that he met with Robert Newsome of the United States Embassy in Albania in May 2007 and that Newsome knew that AEY was sending shipments of "Soviet & Chinese arms to the Afghan government." Diveroli points to an email from Newsome as evidence that Newsome tacitly endorsed the shipment of Chinese ammunition. But in the email, Newsome wrote that the "Embassy sees no role at this point for us to intervene on AEY's behalf under these circumstances." This statement offered no endorsement of the illegal shipment of Chinese arms, and Diveroli fails to allege that Newsome had the actual authority to approve the shipments. Diveroli instead knew that Newsome lacked the authority to permit the shipment of Chinese arms because, a month before Diveroli's meeting with Newsome, the State Department told Diveroli, "Exceptions to the policy require a presidential determination." And

12

in response to Diveroli's inquiry, the State Department told him that he could not ship Chinese ammunition under the contract. Diveroli's defense of public authority is frivolous and contradicted by the record.

### B. Any Error Committed by the District Court in Determining Whether Diveroli Suffered Prejudice Was Harmless.

Diveroli argues that the district court applied the wrong legal standard for prejudice in denying his motion to vacate, but any error was harmless. The district court cited *Atkins v. Attorney General of Alabama* for the proposition that prejudice should be evaluated from the "perspective of counsel." 932 F.2d 1430, 1432 (11th Cir. 1991). We agree with Diveroli that the correct legal standard required the district court to determine whether Diveroli "would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59, 106 S. Ct. at 370. Despite this misstep, the district court also determined that "there is not a reasonable probability that . . . [Diveroli] would have insisted on going to trial." Because the district court determined that there was not a reasonable probability that Diveroli would have insisted on going to trial, any error "had no substantial influence on the outcome, and . . . reversal is not warranted." *United States v. Hawkins*, 905 F.2d 1489, 1493 (11th Cir. 1990).

The district court correctly determined that Diveroli was not entitled to relief. To obtain relief, Diveroli had to "convince the court that a decision to reject

13

the plea bargain would have been rational under the circumstances." *Padilla*, 559 U.S. at 372, 130 S. Ct. at 1485. But the record establishes that Diveroli faced overwhelming evidence of guilt and had no valid affirmative defenses.

It would not have been rational for Diveroli to reject his plea bargain. In exchange for Diveroli pleading guilty to the conspiracy count, the government dismissed 83 substantive counts against him and agreed to recommend a 2 or 3 level decrease for acceptance of responsibility. The conspiracy charge had a maximum sentence of only five years of imprisonment, *see* 18 U.S.C. § 371, but the dismissed wire-fraud charges had maximum sentences of twenty years of imprisonment, *see id.* § 1343. Diveroli could not establish that it would have been rational to reject this plea agreement given its favorable terms and his near-certain conviction.

## IV. CONCLUSION

We **AFFIRM** the denial of Diveroli's motion to vacate.

14