[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-11757

_____

D.C. Docket Nos. 9:12-cv-80164-DMM,
9:09-cr-80056-DMM-1

REYNALDO CASTILLO,

Petitioner-Appellant,

versus

UNITED STATES OF AMERICA,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 15, 2016)

Before WILLIAM PRYOR and FAY, Circuit Judges, and ROBRENO,[*] District
Judge.

WILLIAM PRYOR, Circuit Judge:

_____

[*] Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of
Pennsylvania, sitting by designation.

This appeal requires us to decide whether the district court should have held an evidentiary hearing before it denied Reynaldo Castillo's motion to vacate his sentence for his counsel's failure to move to suppress the fruits of a warrantless search and to dismiss his indictment. Before conducting the search, a pretrial intervention officer received a tip that Castillo possessed a firearm in violation of his pretrial intervention agreement. The officer searched Castillo's house, over his objection, and observed a bolt-action rifle in his bedroom. Based on that information, the police obtained a search warrant for the house, where they found 13 guns. Federal authorities then convicted Castillo of illegally possessing and making guns, 26 U.S.C. §§ 5861, 5871. He later filed a motion to vacate, 28 U.S.C. § 2255, which the district court denied without an evidentiary hearing. We conclude that the warrantless search of Castillo's house was reasonable because the pretrial intervention officer had reasonable suspicion, because the supervision permitted by the pretrial intervention agreement gave Castillo a diminished expectation of privacy, and because the state has strong interests in the effectiveness of its pretrial intervention program. We affirm the denial of Castillo's motion without an evidentiary hearing.

## I. BACKGROUND

In 2008, Reynaldo Castillo entered a pretrial intervention program as part of a deferred prosecution agreement with the State of Florida. Florida offers the

2

program to first-time offenders and some second-time offenders, Fla. Stat. § 948.08(2), who are then supervised by probation officers. Although Castillo did not plead guilty in court, he confessed to five counts of burglary and one count of dealing in stolen property. Castillo's pretrial intervention agreement had several conditions, including that he would "neither possess [nor] carry any firearm or weapon," that he would "truthfully answer all inquiries by [his] Pretrial Intervention Officer," that "the officer may visit [his] home . . . or elsewhere without [his] prior approval," that he would "comply with all instructions he or she may give [him]," and that he would "submit to a urinalysis, breathalyzer, or blood tests at any time requested by [his] Pretrial Intervention Officer." If Castillo violated any of these conditions during the 18 months of the program, Florida reserved the right to prosecute him for the charges to which he had confessed.

While Castillo was in the program, Kimberly Greene, the mother of his ex-wife, informed the local probation office that Castillo had a gun. She faxed the officer on duty a copy of a MySpace page with a photograph of a man who appeared to be Castillo. In the photograph, the man held a gun, wore a mask and goggles, and extended his middle finger. The page was entitled "To all you Greene's FUCK YOU! your're [*sic*] all Reynaldo is having a great time with his friends, cause I hang out with female friends." It mentioned Castillo's ex-wife by

3

name and insulted her and her family members. At the bottom it announced, "I promise i will get all of you before i go."

The probation officer on duty, Louis Kurtz, went to Castillo's house to look for the gun. A police officer who accompanied Kurtz for security felt the hood of Castillo's car, which was hot. Kurtz knocked loudly and called Castillo's home and cell phones, but it took about 15 minutes for Castillo to open the door. Castillo denied that he had a gun and objected to the search. Kurtz nonetheless entered the house and saw in Castillo's bedroom a bolt-action rifle, gun cases, multiple calibers of ammunition, Kevlar helmets, and a mask matching the one in the photo.

Based on Kurtz's observations, two police officers applied for a warrant to search Castillo's house. In their affidavit, they swore that Castillo unlawfully possessed firearms "in violation of the laws of the State of Florida, to-wit: The laws prohibiting the possession of firearms in violation of terms of probation contrary to section 948.06." They also stated the details of Kurtz's search and that the pretrial intervention agreement prohibited Castillo from having a firearm. After a state judge issued the warrant, the police seized 13 firearms and over 7,000 rounds of ammunition from Castillo's house.

Federal agents later arrested Castillo, and a jury convicted him of possession of an unregistered short-barreled rifle, 26 U.S.C. § 5861(d); possession of a short-barreled rifle not identified by serial number, *id.* § 5861(i); possession of an

4

unregistered machine-gun receiver, *id.* § 5861(d); making a machine-gun receiver, *id.* § 5861(f); and making a machine gun, *id.* § 5861(f). The district court sentenced Castillo to 96 months of imprisonment and 3 years of supervised release. We upheld the convictions on appeal. *United States v. Castillo*, 409 F. App'x 250 (11th Cir. 2010).

In 2012, Castillo moved to vacate his convictions on six grounds, only two of which are before us now. First, he alleged that his trial counsel was ineffective because he "failed to move the Court to suppress any and all evidence obtained by or as a result of probation officer Louis Kurtz's warrantless and demonstrably illegal search of Castillo's residence." Second, he alleged that his trial counsel was ineffective because he "failed to move the Court to dismiss the indictment based upon Probation Officer Louis Kurtz's illegal search of Castillo's residence." The district court denied Castillo's motion without an evidentiary hearing. We granted a certificate of appealability limited to the following question: "Whether the District Court erred in denying, without an evidentiary hearing, Mr. Castillo's claim that counsel rendered ineffective assistance by failing to move for suppression of the evidence obtained through the fruits of a warrantless search of his house, or for failing to move for dismissal of the indictment."

5

## II. STANDARD OF REVIEW

"We review the denial of an evidentiary hearing for abuse of discretion." *Diveroli v. United States*, 803 F.3d 1258, 1262 (11th Cir. 2015). "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon . . . ." 28 U.S.C. § 2255(b). "We may affirm on any ground supported by the record." *LeCroy v. United States*, 739 F.3d 1297, 1312 (11th Cir. 2014).

## III. DISCUSSION

Because Castillo's motion failed to allege a constitutional violation, he was not entitled to an evidentiary hearing. To prevail on a claim of ineffective assistance of counsel, a prisoner must prove that his counsel rendered deficient performance and that he was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If a search was constitutional, then counsel is not obligated to move to suppress the evidence or dismiss the indictment and a defendant is not prejudiced by counsel's failure to do so. *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *Zakrzewski v. McDonough*, 455 F.3d 1254, 1260–61 (11th Cir. 2006).

The warrantless search of Castillo's home was constitutional. Counsel did not perform deficiently, and Castillo suffered no prejudice.

6

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "'[U]nder [the] general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment." *Samson v. California*, 547 U.S. 843, 848 (first and third alterations in original) (quoting *United States v. Knights*, 534 U.S. 112, 118 (2001)). "Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Id.* (quoting *Knights*, 534 U.S. at 118–19). Neither the Supreme Court nor this Court has applied this standard in the context of a pretrial intervention program, but several decisions about searches of probationers and parolees guide our review. *See id.* at 846 (upholding a suspicionless search of a parolee who was subject to searches as a condition of parole); *Knights*, 534 U.S. at 122 (upholding a search based on reasonable suspicion of a probationer who was subject to searches as condition of probation); *United States v. Carter*, 566 F.3d 970, 971, 974 (11th Cir. 2009) (upholding a search based on reasonable suspicion of a probationer who was subject to unannounced home visits as a condition of probation).

7

We conclude that the warrantless search of Castillo's home was reasonable. Castillo had a diminished expectation of privacy because of his participation in pretrial intervention. Moreover, Florida has important interests in rehabilitating individuals in pretrial intervention and preventing them from offending again. And Officer Kurtz had reasonable suspicion to conduct the search.

Castillo's participation in pretrial intervention reduced his expectation of privacy. "The expectations of privacy of an individual taken into police custody 'necessarily [are] of a diminished scope.'" *Maryland v. King*, 133 S. Ct. 1958, 1978 (2013) (alteration in original) (quoting *Bell v. Wolfish*, 441 U.S. 520, 557 (1979)). The law has long recognized that an arrestee released from custody may remain subject to restraints on his liberty. *See, e.g.*, *Hensley v. Mun. Court*, 411 U.S. 345, 348–49 (1973) (holding that a defendant released on recognizance was in custody for purposes of habeas); 1 Joel Prentiss Bishop, *Criminal Procedure* § 248, at 148 (3d ed. 1880) (defining bail as "the delivery, in legal form, of one under arrest to another or others who thereby become entitled to his custody"); 4 William Blackstone, *Commentaries on the Laws of England* *294 (1769) (explaining that a person free on bail is "supposed to continue in [his sureties'] friendly custody, instead of going to gaol"); 2 Matthew Hale, *The History of the Pleas of the Crown* *124 (1736) (explaining that "he that is bailed, is in supposition of law still in custody, and the parties that take him to bail are in law

8

his keepers"); 2 William Hawkins, *A Treatise of the Pleas of the Crown* 88 (3d ed. 1739) (explaining that in the Court of King's Bench, "a man's Bail are looked upon as his Gaolers of his own choosing and that the Person bailed is in the Eye of the Law for many Purposes, esteemed to be as much in the Prison of the Court by which he is bailed, as if he were in the actual Custody of the proper Gaoler" (footnotes omitted)). Castillo agreed to conditions that allowed home visits from an officer and required him to respond to all questions. *Cf.* 566 F.3d at 974. He even accepted a condition that allowed suspicionless drug tests. Because he was subject to supervision, we conclude that Castillo had a diminished expectation of privacy.

Florida has interests in rehabilitating participants in pretrial intervention and preventing them from reoffending. The Supreme Court has "repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Samson*, 547 U.S. at 853. This interest serves both offenders the state hopes to rehabilitate and citizens the state seeks to protect from future crimes committed by the offender. *See id.* at 853–54; *Knights*, 534 U.S. at 120–21. The Supreme Court has also recognized that parolees and probationers convicted of a crime are more likely to offend than the typical citizen. *See Samson*, 547 U.S. at 853; *Knights*, 534 U.S. at 120–21. Although an individual in pretrial intervention

9

may not be as likely to reoffend as a parolee or probationer, Castillo entered pretrial intervention to rehabilitate himself and prevent recidivism. And Florida could expect that Castillo would be more likely than the average citizen to commit a crime. As a result, Florida could make reasonable intrusions to deter him from offending again.

Warrantless searches of participants in pretrial intervention to ensure compliance with the program can be reasonable under the Fourth Amendment. As an initial matter, the threat of warrantless searches may deter wrongdoing before it begins. *Cf. United States v. Kincade*, 379 F.3d 813, 838–39 (9th Cir. 2004) (discussing the deterrent effect of DNA tests on supervised releasees). And if deterrence fails, a warrantless search can help catch a wayward participant. After Castillo told Officer Kurtz that he had no guns, a search led to the discovery of 13 guns. Participants in pretrial intervention, like parolees and probationers, have a special incentive to cover up new crimes and violations of their agreements because the close supervision in their programs makes it more likely that they will be caught. *See Knights*, 534 U.S. at 120; *Carter*, 566 F.3d at 974. Unduly restricting searches would allow participants to hide evidence of their misdeeds and undermine the effectiveness of the program. *Cf. Samson*, 547 U.S. at 854.

Officer Kurtz was entitled to conduct a warrantless search of Castillo's house so long as he had reasonable suspicion of a crime or a violation of the

10

pretrial intervention program. "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." *Knights*, 534 U.S. at 121. The Supreme Court required only reasonable suspicion to search the probationer in *Knights*, and we likewise required only reasonable suspicion to search the probationer in *Carter*. *See id.*; *Carter*, 566 F.3d at 975. Because the pretrial intervention program reduced Castillo's expectation of privacy and gave Florida strong interests in conducting a search, we conclude that Kurtz too needed only reasonable suspicion.

Kurtz had reasonable suspicion based on the tip and Castillo's behavior that Castillo possessed a firearm in violation of his pretrial intervention agreement. Castillo's former mother-in-law, who served as a victim's advocate for the county, told Kurtz about the MySpace page and faxed him a copy of it. The page depicted a man who appeared to be Castillo holding a gun and extending his middle finger while wearing tactical gear. The author of the page told Castillo's ex-wife and her family, "FUCK YOU!" and threatened to "get all of [them]." When Kurtz arrived at the house, it took about 15 minutes for Castillo to open the door. Taken together, these facts gave Kurtz reasonable suspicion to search the house. Because the search of Castillo's house was constitutional, he cannot establish deficient performance or

11

prejudice for his counsel's failure to move to suppress the fruits of the search or dismiss the indictment.

We do not consider Castillo's argument that the search warrant was invalid because it failed to identify a crime, and we strike the portions of his briefs that address this issue. Our review is limited to the issue specified in the certificate of appealability. *Murray v. United States*, 145 F.3d 1249, 1250–51 (11th Cir. 1998). The certificate specified only the "claim that counsel rendered ineffective assistance by failing to move for suppression of the evidence obtained through the fruits of a warrantless search of his house, or for failing to move for dismissal of the indictment." The certificate does not encompass defects in the warrant that are unrelated to the earlier search without a warrant.

## IV. CONCLUSION

We **AFFIRM** the denial of Castillo's motion to vacate his sentence.

12

ROBRENO, District Judge, concurring:

I agree that Castillo cannot establish deficient performance or prejudice for his counsel's failure to move to suppress the fruits of the search or dismiss the indictment because the search of his house was not constitutionally infirm. Castillo had a diminished expectation of privacy as a participant in the pretrial intervention ("PTI") program, and Officer Kurtz had reasonable suspicion to search the premises.

I write separately, however, to draw a limiting principle around the majority's extension of the Court's decision in United States v. Carter, 566 F.3d 970 (11th Cir. 2009) (per curiam), to a PTI participant, because Carter addressed only whether the warrantless search of a probationer's home was reasonable. The majority equates Castillo to the probationer in Carter because Castillo agreed to conditions that allowed home visits from an officer. The majority also references the Supreme Court's recognition that parolees and probationers convicted of crimes are more likely to offend, and the majority concludes that this logic applies equally to individuals admitted to a PTI program.

While I agree that Castillo's participation in the PTI program reduced his expectation of privacy, I disagree that it did so to the extent and degree that the expectation of privacy is reduced for probationers and parolees. Similarly, I disagree that the government's interest in monitoring PTI participants is

13

necessarily as high as its interest in monitoring probationers and parolees. The Supreme Court in United States v. Knights, 534 U.S. 112 (2001), contemplated a balancing test, not a litmus test.

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Brigham City v. Stuart, 547 U.S. 398, 403 (2006). Reasonableness is defined "in objective terms by examining the totality of the circumstances." Ohio v. Robinette, 519 U.S. 33, 39 (1996). In considering the circumstances of a particular search, the court balances "the degree to which it intrudes upon an individual's privacy" and "the degree to which it is needed for the promotion of legitimate governmental interests." Knights, 534 U.S. at 119 (quoting Wyoming v. Houghton, 526 U.S. 295, 300 (1999)). Both sides of the scale are important because the more reduced the individual's privacy interest, the less interest the government must show in order to intrude upon the individual's privacy.

First, as to Castillo's privacy interests, privacy rights under the Fourth Amendment exist on a continuum. On one end of the continuum sit prisoners whose privacy interests are extinguished by judgments placing them in custody. Hudson v. Palmer, 468 U.S. 517, 526 (1984) (explaining that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell"). On the opposite end of the continuum sits the general population, consisting of individuals who have never been convicted of a felony.

14

See, e.g., Green v. Berge, 354 F.3d 675, 679-81 (7th Cir. 2004) (Easterbrook, J., concurring) (discussing "at least four major categories" of persons with privacy interests "potentially subject to differing legal analysis").

The Supreme Court has recognized that differing degrees of privacy interests lie between the two margins. For example, in Knights, the Court held that a police officer's warrantless search of a probationer's home was reasonable. 534 U.S. at 118. The Court found the defendant's probationary status "salient" and observed that "[p]robation is 'one point . . . on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service.'" Id. at 119 (quoting Griffin v. Wisconsin, 483 U.S. 868, 874 (1987)). Importantly, the probationer's placement on the continuum of possible punishments corresponded to the probationer's placement on the continuum of privacy rights, as the Court recognized that probationers "do not enjoy 'the absolute liberty to which every citizen is entitled.'" Id. (quoting Griffin, 483 U.S. at 874). Because the search in Knights was supported by reasonable suspicion and authorized by a clear condition of the defendant's probation, the warrantless search of his apartment was reasonable. Id. at 122.

The Supreme Court later made clear that "[o]n this continuum, parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." Samson v. California, 547 U.S.

15

843, 850 (2006). The Court concluded in Samson that a parolee "did not have an expectation of privacy that society would recognize as legitimate." Id. at 852. After "[e]xamining the totality of the circumstances pertaining to petitioner's status as a parolee, 'an established variation on imprisonment,' including the plain terms of the parole search condition," the Court held that the suspicionless search of the parolee did not violate the Fourth Amendment. Id. at 857 (quoting Morrissey v. Brewer, 408 U.S. 471, 477 (1972)).

Neither the Supreme Court nor this Court has previously addressed the reasonableness of a search in the context of a pretrial intervention program. And given the Supreme Court's distinction between the privacy rights of probationers and parolees in Samson, I am compelled to note a distinction between the scope and extent of the privacy rights of a probationer or parolee and a PTI participant. On the continuum of privacy rights, a PTI participant sits somewhere between the general public and a probationer.

As an offender without a serious criminal history, Castillo entered into the PTI Agreement with the Palm Beach County State Attorney's Office. To enter the PTI Agreement, Castillo admitted to burglary and dealing in stolen property by use of the internet, but he did not plead guilty to those crimes in a court of law. In exchange for the state's promise not to prosecute, Castillo agreed that a PTI officer "may visit [Castillo's] home, employment, school, or elsewhere without

16

[Castillo's] prior approval and comply with all instructions he or she might give [Castillo]."

Unlike the conditions of probation at issue in <u>Knights</u>, Castillo's PTI conditions were not "a form of criminal sanction" akin to incarceration that were "imposed by a court upon an offender after verdict, finding, or plea of guilty." <u>Knights</u>, 534 U.S. at 119 (quoting <u>Griffin</u>, 483 U.S. at 874). In contrast to probation or parole, the PTI program is not court imposed or subject to judicial review. <u>State v. Board</u>, 565 So. 2d 880, 881 (Fla. Dist. Ct. App. 1990) ("A court can no more compel the state to reinstate a defendant's pretrial intervention status than it can compel the state to place the defendant on pretrial intervention in the first place."). Rather, the PTI program is a creation of Florida law that grants the state attorney the right to make a final determination as to whether the prosecution will continue, Fla. Stat. § 948.08(5) (2013), and the Florida Supreme Court has recognized that admission to the PTI program is within the state attorney's sole discretion. <u>Cleveland v. State</u>, 417 So. 2d 653, 654 (Fla. 1982) ("The pretrial intervention program is merely an alternative to prosecution and should remain in the prosecutor's discretion.").

Additionally, a PTI participant waives important rights, such as the right to speedy trial. Fla. Stat. § 948.08(2). But the waiver of these rights is not "punishment[] for criminal convictions," <u>Knights</u>, 534 U.S. at 119, because the PTI

17

participant has not been convicted at all. If the participant does not satisfy the program's requirements, the program administrator can merely recommend that the case "revert to the normal channels of prosecution," "the offender is in need of further supervision," or the "dismissal of charges without prejudice . . . be entered." Fla. Stat. § 948.08(5)(a)-(c). The PTI Agreement is "essentially a conditional decision not to prosecute [for a certain period of time] similar to the nolle prosequi situation." Cleveland, 417 So.2d at 654. This entire PTI Agreement is formed and implemented without judicial oversight.

Although I agree that a PTI participant has a diminished expectation of privacy compared to the general public, the PTI participant cannot be considered commensurate with a probationer or parolee on the continuum of Fourth Amendment privacy rights in light of these patent differences.

Second, on the other side of the Knights balancing test, the government's interest in monitoring PTI participants is not as demonstrably strong as the government's interest in monitoring probationers or parolees. In Knights and Samson, the Court determined that the government has an "overwhelming interest" in monitoring probationers and parolees, which warrants "privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." Samson, 547 U.S. at 853.

18

Specifically, the Court in Knights credited "the very assumption of the institution of probation" that a probationer is "more likely than the ordinary citizen to violate the law." Knights, 534 U.S. at 119–21 (quoting Griffin, 483 U.S. at 880). Likewise, in Samson, the Court considered the government's interest to be "substantial" in "reducing recidivism and thereby promoting reintegration and positive citizenship" for parolees. Samson, 547 U.S. at 853. In both cases, the government validated these assumptions and established its interest in regulating individuals who had been previously convicted of crimes by relying on recognized statistical rates concerning recidivism. See id. (discussing several statistical studies that indicate a parolee's higher propensity to offend); Knights, 534 U.S. at 120 (examining studies by the U.S. Department of Justice, Bureau of Justice Statistics and concluding that the recidivism rate of probationers is significantly higher than the general crime rate).

Following Knights, this court in Carter stated that the government's interest in preventing a probationer from committing further crimes was "high." 566 F.3d at 974. It cited Knights for the proposition that "the government's interest in monitoring a probationer stems from a probationer's propensity to commit more crimes, as well as a probationer's motivation to hide the evidence of his crimes." Id. The court pointed out that, unlike the defendant in Knights, the defendant in Carter "was on probation for both a violent felony and a drug-related felony." Id.

19

(emphasis in original). As such, the court concluded that "where the probationer has a history of drug and violence-related felonies, the government's interest in monitoring the probationer is particularly high." Id.

Although the propensity of a PTI participant to offend may exceed that of the general public, it is unclear on this record whether that possible propensity is identical to the verified proclivity of probationers that was presented in Knights or of parolees that was presented in Samson. Participation in the PTI program is available to only a "first offender" or "person previously convicted of not more than one nonviolent misdemeanor." Fla. Stat. § 948.08(2). As a PTI participant without a serious criminal history, Castillo stands in contrast to the Carter probationer, whose history of drug and violence-related felonies shaped the government's "particularly high" interest. Therefore, the government does not necessarily have the same substantial interest in monitoring a PTI participant like Castillo as it does in monitoring probationers and parolees.

Without equating Castillo to a probationer or parolee, I nevertheless conclude that the particular circumstances surrounding Castillo's situation do "not sway the Knights balancing test such that [Officer Kurtz] needed more than reasonable suspicion to conduct a search." United States v. Yuknavich, 419 F.3d 1302, 1311 (11th Cir. 2005). Reasonable suspicion consists of "a sufficiently high probability that criminal conduct is occurring to make the intrusion on the

20

individual's privacy interest reasonable." Knights, 534 U.S. at 121. "When making a determination of reasonable suspicion, [this court] must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." Yuknavich, 419 F.3d at 1311 (quoting United States v. Perkins, 348 F.3d 965, 970 (11th Cir. 2003)).

Here, before conducting the search, Officer Kurtz received information that Castillo had an assault rifle and made specific threats to identifiable individuals. It is this information, combined with Castillo's participation in the PTI program--and not his participation in the PTI program alone--that created reasonable and sufficiently particularized suspicion to justify the search of Castillo's house. I therefore concur in the result reached by the majority.