[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-11765

_____

D.C. Docket No. 9:10-cr-80149-KAM-30

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSPEH CASTRONUOVO, M.D.,
CYNTHIA CADET, M.D.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(May 17, 2016)

Before WILLIAM PRYOR and FAY, Circuit Judges, and ROBRENO,[*] District
Judge.

_____

* Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of
Pennsylvania, sitting by designation.

ROBRENO, District Judge:

Defendants Joseph Castronuovo and Cynthia Cadet ("Defendants") appeal their judgments of conviction under 18 U.S.C. § 1957 for conspiracy to engage in monetary transactions affecting interstate commerce in criminally derived property exceeding $10,000, also known as conspiracy to commit money laundering. After reviewing the record and hearing oral argument, we affirm the judgement of conviction for both Defendants.

## I.    BACKGROUND

Defendants were indicted by a federal grand jury in the Southern District of Florida and charged alongside thirty other individuals for their roles in an illegal "pill mill" operation involving two pain management clinics owned by Christopher George: American Pain and Executive Pain. The clinics' operations depended on doctors, like Defendants, who were licensed to prescribe and dispense narcotics. George paid the doctors a portion of their salary by check and the rest by cash. Before receiving their weekly paychecks, the doctors would sign forms that stated "I did not see anything illegal happen or do anything illegal at the office."

Defendant Cadet began working at American Pain, formerly called South Florida Pain, after responding to a Craigslist ad for employment. During her interview, George told Cadet that "we prescribe medication here for people that

2

allege to be in pain, and that's all we do." He told her that she would earn $75 per patient and $1,000 per week for the use of her dispensing license.

Once employed, Cadet saw as many as 100 patients per day. On one particular day, surveillance videos and patient records indicated that Cadet spent an average of 4 minutes and 40 seconds with each patient, and prescribed a total of 15,860 Oxycodone pills at 30 mg each; 5,790 Oxycodone pills at 15 mg each; and 3,600 Xanax pills at 2 mg each. One patient testified at trial that Cadet prescribed pills to him after merely checking his blood pressure and reviewing his prescriptions from George's other clinic. Cadet also signed drug-supplier forms that falsely underestimated how many patients were seen daily, how many received prescriptions for controlled substances, and how many were from other states.

The Internal Revenue Service ("IRS") determined that Cadet received a total of $1,217,125 in compensation during her tenure. And Drug Enforcement Agency ("DEA") records showed that 878,600 Oxycodone pills were dispensed under Cadet's license between 2008 and 2010.

Defendant Castronuovo also responded to one of George's employment ads for a position at Executive Pain. During the interview, George stated that Castronuovo would be paid $75 per patient to prescribe pain medication and shared sample charts displaying patients' Oxycodone and Xanax prescriptions. George described the clinics' "business model" during the interview and testified

3

that he "wouldn't have hired [Castronuovo]" if Castronuovo had not agreed to the clinics' prescription practices.

A statistical sample of Castronuovo's patient files showed that Castronuovo engaged in a "pattern" of prescribing Oxycodone, Xanax, and sometimes Soma. Like Cadet, Castronuovo signed documents falsely stating the number of patients from out of state and the number of patients receiving controlled substances. Because Castronuovo worked only part time, George paid him up to $200 per day for use of his dispensing license. But Castronuovo also received $75 for each patient he saw. Moreover, seized surveillance footage corroborated that he received $3,200 for seeing 40 patients on one particular day and $4,025 for seeing 51 patients on another day. The IRS determined that Castronuovo received a total of $164,025 during his tenure. And DEA records showed that 328,600 Oxycodone pills were dispensed under Castronuovo's license between 2008 and 2010.

On March 3, 2010, government agents executed search warrants at both clinics and recovered surveillance videos from American Pain's security cameras. Agents also seized all patient files and patient logs, which listed how many patients each doctor saw and dictated each doctor's pay.

On January 18, 2011, before he was charged with any crimes, Castronuovo and his attorney met with prosecutors and DEA agents to describe his prescription practices and compensation from the clinic. Castronuovo stated that he received

4

$75 per patient, with a minimum daily total of $1,500. He explained that George paid him in cash during his first five months of employment and then by check.

The original indictment charged George, the clinics' owner, with unlawful possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Then, the first superseding indictment charged thirty-two clinic staff members and doctors, including Cadet and Castronuovo. Therein, Cadet was charged as part of a racketeering conspiracy, in violation of 18 U.S.C. § 1961(1) and (5); money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and an Oxycodone trafficking conspiracy, in violation of 21 U.S.C. § 841(a)(1). Both Cadet and Castronuovo were charged with mail/wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.

After a majority of the codefendants pled guilty, Cadet and Castronuovo were charged in a second superseding indictment with conspiracy to traffic in Oxycodone, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 859(a), and conspiracy to engage in money laundering, in violation of 18 U.S.C. §§ 1956(h) and 1957. In addition, Cadet was charged individually with two counts of Oxycodone and Alprazolam distribution resulting in deaths, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); five counts of Oxycodone distribution resulting in deaths, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); and one count of conspiracy to distribute anabolic steroids, in violation of 21 U.S.C. §§ 841(a)(1)

5

and 829(e). Castronuovo was charged individually with one count of Oxycodone distribution, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 859(a), and two counts of Oxycodone distribution resulting in deaths, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

Defendants pled not guilty and proceeded to trial. After the district court denied Castronuovo's motion to sever his trial from Cadet's, Defendants were tried together and agreed that objections made by one were joined by the other unless otherwise stated.

After a 31-day trial and four days of deliberations, the jury reported that they had reached a verdict and submitted the verdict forms. When the district court examined the returned verdict forms, it noted that "[t]he forms are not completely filled out" and instructed the jury to return to the deliberation room to "fill out either guilty or not guilty on all of the counts." The district court explained that "[y]ou can't leave it blank . . . We need to know what your decision is on each of those counts where you've left it blank." The court told the jury to send a note if they did not understand the instructions, and no party objected to these directions.

Shortly thereafter, the jury sent a note reporting that it was "deadlocked" on certain counts. After all parties agreed, the district court gave a modified Allen instruction based on the Eleventh Circuit Pattern Jury Instructions. Approximately 2 to 2 ½ hours later, the jury returned a guilty verdict against Defendants on the

money laundering conspiracy count. Defendants were acquitted on all other charges.

The district court entered judgment against both Defendants after denying their post-trial motions. It sentenced Castronuovo to 18 months' imprisonment and two years' supervised release. It sentenced Cadet to 78 months' imprisonment and two years' supervised release. Defendants now appeal.

## II.    STANDARDS OF REVIEW

Numerous standards of review govern the issues on appeal. "We review the sufficiency of evidence to support a conviction de novo." United States v. Taylor, 480 F.3d 1025, 1026 (11th Cir. 2007). As to a cumulative error argument, we review de novo the cumulative impact of the alleged errors at trial. United States v. Dohan, 508 F.3d 989, 993 (11th Cir. 2007). We also review a claim of prosecutorial misconduct de novo "because it is a mixed question of law and fact." United States v. Duran, 596 F.3d 1283, 1299 (11th Cir. 2010).

"We review a district court's denial of a motion to dismiss an indictment for abuse of discretion but, in determining whether the court abused its discretion, we resolve issues of law de novo." United States v. Cavallo, 790 F.3d 1202, 1219 (11th Cir. 2015). We also review de novo the issue whether jury instructions constructively amended the indictment, United States v. Gutierrez, 745 F.3d 463, 473 (11th Cir. 2014), but when a defendant raises this argument for the first time

7

on appeal, we review it for plain error, United States v. Madden, 733 F.3d 1314, 1322 (11th Cir. 2013).

"The grant or denial of a motion to suppress evidence is reviewed in this Court as a mixed question of law and fact. We assess the district court's findings of fact under the clearly erroneous standard and review the application of the law to the facts de novo." United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003) (citation omitted).

We review for abuse of discretion a district court's ruling on a severance motion, its limitation on the scope of cross-examination, its decision to give an Allen charge, and its refusal to give a requested jury instruction. See United States v. Maxwell, 579 F.3d 1282, 1295 (11th Cir. 2009) (limitation of cross-examination); United States v. Westry, 524 F.3d 1198, 1216 (11th Cir. 2008) (jury instruction); United States v. Woodard, 531 F.3d 1352, 1364 (11th Cir. 2008) (Allen charge); United States v. Kennard, 472 F.3d 851, 859 (11th Cir. 2006) (severance motion). But where a defendant does not request specific instructions and fails to object at trial to the district court's failure to include specific instructions, we review for plain error only. United States v. Pena, 684 F.3d 1137, 1151 (11th Cir. 2012).

8

### III.    DISCUSSION

Defendants[1] raise a number of issues on appeal: (1) whether there was sufficient evidence to convict Defendants for money laundering conspiracy; (2) whether the district court erred in denying Castronuovo's motion to dismiss the Second Superseding Indictment; (3) whether the district court erred in dismissing Castronuovo's motion to suppress his pre-indictment statements; (4) whether the district court erred in denying Castronuovo's motion to sever; and (5) whether the district court coerced the jury by effectively delivering two <u>Allen</u> charges.

Also, Cadet raises the issue (6) whether she should be granted a new trial based on the cumulative prejudicial effect of: (a) the district court's constructive amendment of the indictment; (b) the prosecutor's argument based on "guilt by association"; (c) the district court's limitation on the scope of cross-examination; and (d) the district court's failure to give a good faith instruction for the money laundering conspiracy charge. Each issue is discussed in turn.

A.    <u>Sufficiency of the Evidence as to the Money Laundering Convictions</u>

Title 18 U.S.C. § 1956(h) makes it unlawful to conspire to violate any provision of §§ 1956 or 1957. In turn, § 1957 makes it unlawful to engage in monetary transactions in property derived from "specified unlawful activity." 18

---

[1]    Castronuovo moved to adopt three of Cadet's arguments on appeal, and we granted the motion. Those adopted arguments are designated by footnote in this opinion.

U.S.C. § 1957. Together, these provisions make it unlawful to engage in a money laundering conspiracy.

Here, the jury convicted Defendants of conspiring to violate § 1957 by agreeing "to knowingly engage and attempt to engage in monetary transactions . . ., in criminally derived property of a value greater than $10,000." The "specified unlawful activity" was "the distribution, dispensing and possession with intent to distribute and dispense[] oxycodone, a Schedule II narcotic controlled substance, outside the scope of professional practice and not for a legitimate medical purpose."

To establish the existence of a money laundering conspiracy, the government was required to prove beyond a reasonable doubt "(1) an agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement by the defendant." United States v. Moran, 778 F.3d 942, 962 (11th Cir. 2015) (quoting United States v. Broughton, 689 F.3d 1260, 1280 (11th Cir. 2012)). No evidence of willfulness or specific intent is required, Dohan, 508 F.3d at 994, and conviction does not require proof of an overt act in furtherance of the conspiracy. Whitfield v. United States, 543 U.S. 209, 214 (2005).

Defendants argue that the government did not present sufficient evidence for the jury to find beyond a reasonable doubt that they conspired to commit money

10

laundering. The question for our review is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Musacchio v. United States</u>, 136 S. Ct. 709, 715 (2016) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)). "That limited review does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" <u>Id.</u> (quoting <u>Jackson</u>, 443 U.S. at 319).

### 1.    <u>An agreement between two or more persons to commit the money laundering offense</u>

To satisfy the first element of money laundering conspiracy, no evidence of a "formal agreement" is required; instead, the government may "demonstrate by circumstantial evidence a meeting of the minds to commit an unlawful act." <u>United States v. Arias-Izquierdo</u>, 449 F.3d 1168, 1182 (11th Cir. 2006). "Proof that the accused committed an act which furthered the purpose of the conspiracy is an example of the type of circumstantial evidence the government may introduce to prove the existence of agreement." <u>Id.</u> The government need not prove that a conspiracy participant knew all details of the conspiracy or participated in its every aspect. <u>United States v. Arbane</u>, 446 F.3d 1223, 1229 (11th Cir. 2006) (citing <u>United States v. Fernandez</u>, 797 F.2d 943, 948–49 (11th Cir. 1986)). Rather, the government need only prove that the defendant knew "the essential nature of the

11

conspiracy." Moran, 778 F.3d at 960 (quoting United States v. Vernon, 723 F.3d 1234, 1273 (11th Cir. 2013)).

Here, viewing the evidence in the light most favorable to the government, a rational jury could have found, beyond a reasonable doubt, an agreement between two or more persons to commit a money laundering offense. First, the evidence showed that Defendants knew the conspiracy's essential nature: to obtain payment of funds received through the illegal sale of Oxycodone at the clinics. During Cadet's interview, George told her that "we prescribe medication here for people that allege to be in pain, and that's all we do." He told her that she would earn $75 per patient and $1,000 per week for the use of her dispensing license. Similarly, during Castronuovo's interview, George told him that he would be paid $75 per patient and showed him sample charts displaying "the types of medication that were prescribed there." George described the clinics' "business model" during the interview and testified that he "wouldn't have hired [Castronuovo]" if he had not agreed to the clinics' prescription practices. In addition to the $75 fee per patient, George paid him up to $200 per day to use his dispensing license.

While there is no direct evidence that Defendants separately agreed to deposit their paychecks into their personal bank accounts, direct evidence is rarely available to prove a conspiracy's existence. United States v. Pineiro, 389 F.3d 1359, 1369 (11th Cir. 2004). Here, George paid Defendants, in part, with checks

12

drawn from a bank account at Bank of America. Defendants then accepted the checks made payable to them with knowledge that the checks' funds were derived from the clinics' operations. Defendants also endorsed and negotiated the checks through a financial institution in an amount exceeding $10,000. Based on this evidence and common knowledge that checks must be negotiated to transfer possession of their funds, a rational juror could conclude that Defendants accepted the checks with the intent to deposit them into their personal bank accounts. See United States v. Gainey, 111 F.3d 834, 836 (11th Cir. 1997) (explaining that "the law permits jurors to 'apply their common knowledge, observations and experiences in the affairs of life'" when "evaluating the facts of a case" (quoting United States v. Cruz-Valdez, 773 F.2d 1541, 1546 (11th Cir. 1985) (en banc))). Thus, the evidence was sufficient for a rational juror to conclude that Defendants agreed to engage in monetary transactions in criminally derived property valued greater than $10,000 by accepting their paychecks with knowledge that the funds were derived from the clinics' unlawful activity.

Defendants[2] argue that a conviction for money laundering conspiracy on these facts renders § 1956(h) "impermissibly broad" because "[w]ithout insisting upon proof of a separate agreement, virtually any conspiracy involving the exchange of funds would automatically be punishable as money laundering." The

---

[2]    Castronuovo adopts this argument made by Cadet.

Court need not consider this argument further. As discussed above, there was sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Defendants separately agreed to engage in financial transactions upon accepting profits from the clinics' operations.[3]

Castronuovo also contends that the evidence was insufficient because it showed multiple conspiracies rather than a single conspiracy. According to Castronuovo, the evidence reflected the kind of "rimless wheel" or "hub-and-spoke" conspiracy described in Kotteakos v. United States, 328 U.S. 750, 755 (1946), and United States v. Chandler, 388 F.3d 796, 807 (11th Cir. 2004). The courts in Kotteakos and Chandler reversed convictions because the types of conspiracies proven at trial constituted material variances from the indictments in those cases, and Castronuovo contends that the same result should be reached here.

"A variance occurs when the facts proved at trial deviate from the facts contained in the indictment but the essential elements of the offense are the same." United States v. Keller, 916 F.2d 628, 634 (11th Cir. 1990). A variance is reversible error only when "the facts established at trial materially diverge from the

---

[3]    Defendants additionally cite the rule of lenity to support this argument, but the rule of lenity is inapplicable, because there is not a "grievous ambiguity or uncertainty" in § 1956(h). United States v. Maupin, 520 F.3d 1304, 1307 (11th Cir. 2008) (quoting Muscarello v. United States, 524 U.S. 125, 138 (1998)).

facts in the indictment and the defendant suffers substantial prejudice as a result." United States v. Weissman, 899 F.2d 1111, 1114 (11th Cir. 1990).

A variance is material "if the government proves multiple conspiracies under an indictment alleging only a single conspiracy." United States v. Castro, 89 F.3d 1443, 1450 (11th Cir. 1996) (citing Kotteakos, 328 U.S. 750). On review, we look at the evidence in the light most favorable to the government and ask whether a reasonable trier of fact could have determined beyond a reasonable doubt that a single conspiracy existed. United States v. Seher, 562 F.3d 1344, 1366 (11th Cir. 2009). We will not disturb the jury's finding of a single conspiracy if it is supported by substantial evidence. Id. To determine whether the jury could have found a single conspiracy, we consider (1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants. United States v. Edouard, 485 F.3d 1324, 1347 (11th Cir. 2007).

Here, viewing the evidence in the light most favorable to the government, a rational juror could have found beyond a reasonable doubt that there was a single, overarching conspiracy. Defendants shared a common goal—to obtain payment from the clinics' illegal operations—and each Defendant acted in concert to further this goal. The clinics' continued operation relied on Defendants' and other doctors' willingness to prescribe Oxycodone in mass quantities. The nature of the clinics' scheme relied on using those same doctors' dispensing licenses to obtain the pills

15

that the clinics sold. Moreover, evidence that Defendants sold pills to the same patients and George instructed Castronuovo to shadow Cadet as training indicates a direct overlap in participants. Because this evidence was sufficient for a reasonable jury to find that a single conspiracy existed, there was no material variance.

## 2.    Knowledge and Intent

As to the second element of money laundering conspiracy, a rational jury could have found beyond a reasonable doubt that Defendants agreed to commit a money laundering offense "with the requisite knowledge and intent." United States v. Magluta, 418 F.3d 1166, 1174 (11th Cir. 2005). Specifically, the evidence showed that Defendants knew "that the property involved . . . represent[ed] the proceeds of some form of unlawful activity." 18 U.S.C. § 1956(a)(1); see also United States v. Martinelli, 454 F.3d 1300, 1312 n.8 (11th Cir. 2006).

Other clinic doctors and personnel discussed the clinics' adverse media coverage with Cadet and in her presence. And Castronuovo testified that he continued to work at the clinic despite knowing that its operations were illegal, referring to the clinics' patients as "junkies" and "pillbillies." Viewing this evidence in the light most favorable to the government, a rational juror could conclude that Defendants knew that they were being paid for their roles in the clinics' unlawful distribution of narcotics.

16

Defendants' acquittal on the underlying drug conspiracy charge does not affect the sufficiency of the evidence as to this second element. "It is by now abundantly clear that in a money laundering case (or in a money laundering conspiracy case), the defendant need not actually commit the alleged specified unlawful activity." Id. at 1312. Moreover, "inconsistent jury verdicts are not necessarily a cause for reversal of a conviction." United States v. Lozano-Hernandez, 89 F.3d 785, 789 (11th Cir. 1996). Indeed, we have maintained that conviction on only one of two related counts may be upheld where "[d]ifferent elements comprise the two offenses." Id. (citing United States v. Powell, 469 U.S. 57, 65–67 (1984)).

Here, different elements comprise the drug trafficking conspiracy and money laundering conspiracy offenses. Compare 21 U.S.C. §§ 841(a)(1), 846, 859(a), with id. §§ 1956(h), 1957. And as the district court noted, even though the jury ultimately determined that Defendants did not personally distribute narcotics unlawfully, there was evidence for the jury to nevertheless find "that the other medical doctors were engaging in such unlawful conduct, that the money they received for working at the clinics was proceeds from that illegal activity, and that they agreed to conspire with the others to launder those illegal proceeds."

Cadet argues that she did not know that her prescriptions were for an illegitimate medical purpose. She avers that her income was derived on a per-

17

patient basis; she did not have ownership interest in the clinics; and she did not receive money directly from narcotics sold at other clinics. But § 1957 specifically states that "[i]n a prosecution for an offense under this section, the Government is not required to prove that the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity." 18 U.S.C. § 1957(c). Plus, Cadet's conviction was not for substantive promotional money laundering, so the government was not required to prove that she personally reinvested the illegal proceeds into the clinics' criminal activities. Compare 18 U.S.C. § 1956 (a)(1)(A)(i) (promotional money laundering), with id. § 1957(a) (monetary transactions derived from specified unlawful activity). And despite receiving some payments directly from patients, who she saw only by virtue of her position at the clinic, Cadet also received $1,000 per week for use of her dispensing license. Because there was sufficient evidence for a rational jury to find both elements of money laundering conspiracy beyond a reasonable doubt, we will uphold Defendants' convictions.

B. Motion to Dismiss Second Superseding Indictment for Grand Jury Abuse

Castronuovo next argues that the district court erred in denying his motion to dismiss the second superseding indictment for grand jury abuse. He specifically alleges prosecutorial vindictiveness and prosecutorial misconduct. But dismissing an indictment is an "extreme sanction which should be infrequently utilized."

18

United States v. O'Keefe, 825 F.2d 314, 318 (11th Cir. 1987). And the district court determined that such an extreme sanction was not warranted here.

### 1.    Second superseding indictment as retaliation

First, Castronuovo contends that the prosecutor vindictively used the second superseding indictment to retaliate against Castronuovo for exercising his procedural rights—namely, his right to plead not guilty and his right to move for severance.

Dismissal of an indictment for prosecutorial vindictiveness is based on the principle that a defendant "may not be punished for exercising a protected statutory or constitutional right." United States v. Goodwin, 457 U.S. 368, 372 (1982). A rebuttable presumption of vindictiveness arises where the government takes unilateral action, such as obtaining a superseding indictment alleging additional or more serious charges, in a context that indicates a reasonable likelihood of vindictiveness as a response to the defendant's exercise of his rights. Id. at 372–77. Where the facts do not give rise to a presumption, the defendant may show actual vindictiveness by proving that the government acted solely to penalize him. Id. at 380–81 & n.12.

No grounds for a presumption of vindictiveness exist here. After Castronuovo decided to plead not guilty to the mail/wire fraud count in the first superseding indictment, the government continued its investigation into patient

deaths. It then sought the second superseding indictment, which was proper. See United States v. Cole, 755 F.2d 748, 757–58 (11th Cir. 1985) (explaining that additional, warranted charges may be brought against a defendant who declines to negotiate a lesser guilty plea).

Castronuovo also fails to show actual vindictiveness because he has not proven that the government filed the second superseding indictment solely to penalize him. Castronuovo argues that once he expressed his intent to move for a severance, the government took six months to return the second superseding indictment when it initially stated that it would be returned in less than a month. But Castronuovo fails to show that the longer timeline was intentional or prejudicially affected his rights. Because Castronuovo has not shown that the government delayed solely to penalize him, the district court did not err in refusing to dismiss the second superseding indictment.

### 2.    Prosecutorial misconduct

Second, Castronuovo contends that the prosecutor's improper questions and inflammatory comments during the grand jury process prejudiced his rights. "'A prosecutor is . . . forbidden to make improper suggestions, insinuations and assertions calculated to mislead the jury' and may not appeal to the jury's passion or prejudice." United States v. Rodriguez, 765 F.2d 1546, 1560 (11th Cir. 1985) (quoting United States v. Phillips, 664 F.2d 971, 1030 (5th Cir. Unit B 1981)).

"When the alleged prosecutorial misconduct occurs in the context of a grand jury proceeding, we dismiss the indictment only when the misconduct 'substantially influenced the grand jury's decision to indict' or when there is 'grave doubt that the decision to indict was free from the substantial influence of such violations.'" United States v. Cavallo, 790 F.3d 1202, 1219 (11th Cir. 2015) (quoting Bank of Nova Scotia v. United States, 487 U.S. 250, 256 (1988)).

Here, Castronuovo identifies a number of troubling comments made by the prosecutor during the grand jury proceedings. For example, one juror asked about the two patient deaths. The juror asked if the deceased underwent MRI exams, stating that "the person could have given [Castronuovo] that information and typically, a physical exam without any cardio–." But the prosecutor cut off the juror's question. The prosecutor said, "If this was a real doctor. Again, the evidence has reflected that these were pill mill doctors that were there to spend the least amount of time possible." The prosecutor further stated that the other doctors, who had admitted to drug dealing activity, would testify at trial "that they were drug dealers and they did the same thing these two did."

The prosecutor also asked one grand jury witness, Dr. Baden, whether he would "want to know if Dr. Castronuovo was a criminal or not" as a forensic pathologist expert that worked on the case. Dr. Baden answered that "I'm here to talk about how somebody died, not if he's a criminal" and later stated that "unlike

21

television, the medical examiner is not an investigator." But the prosecutor did not stop there. Instead, he asked the following: "Are you aware, sir, that this very grand jury indicted 32 people for running illegal pill mills, 28 of whom have pled guilty, are in prison right now, and also previously filed charges against Dr. Castronuovo?" Dr. Baden responded by saying he was "[v]aguely aware of it," but that "[a]ll I'm dealing with are two deaths."

The prosecutor then asked Dr. Wright, another expert witness, if he had "ever been in Broward County Hospital to see the babies born addicted to Oxycodone?" The prosecutor stated that "in 2009, nearly 1,000 babies who were born in Florida hospitals were treated for drug withdrawal syndrome" and concluded that "[i]t's fairly obvious that Dr. Castronuovo illegally prescribed these drugs. He was, in fact, just a drug dealer."

This conduct, when viewed in its totality, was more flagrant than a "few unwitting and inadvertent gestures by the prosecutor." United States v. Pabian, 704 F.2d 1533, 1540 (11th Cir. 1983). But Castronuovo has not "established that the violation[s] substantially influenced the grand jury's decision to indict" and the record does not establish "'grave doubt' that the decision to indict was free from the substantial influence of such violations." Bank of Nova Scotia, 487 U.S. at 256–57 (quoting United States v. Mechanik, 475 U.S. 66, 78 (1986) (O'Connor, J., concurring)). The strength of the evidence on the drug and money laundering

22

conspiracies was significant. For example, the grand jurors were informed that the investigation required examination of patient files, wiretapped conversations, surveillance recordings, and autopsy reports. The jurors were also presented with statistics from a dispensing tracking system as to how many units of Oxycodone were ordered and/or received under Defendants' dispensing licenses. And an FBI special agent testified that Cadet earned in excess of one million dollars, paid in cash and by check, from her prescribing activities, while Castronuovo earned over $100,000.

Moreover, the petit jury, which did not hear the prosecutor's remarks, found Castronuovo guilty for conspiracy to commit money laundering. See United States v. Flanders, 752 F.3d 1317, 1333 (11th Cir. 2014) ("Thus, the petit jury's guilty verdicts demonstrate that there was probable cause to charge Defendants with the offenses for which they were convicted, and any alleged misconduct before the grand jury was harmless."). Therefore, because Castronuovo has not identified any prejudiced he suffered as a result of the prosecutor's conduct, the district court did not err in denying his motion to dismiss the indictment.

## C.     Motion to Suppress

Castronuovo next argues that the district court erred in denying his motion to suppress his pre-indictment interview statements. Castronuovo avers that the district court should have granted his motion to suppress for two reasons: (1) his

23

statements were inadmissible as part of a plea agreement, and (2) his statements were procured as a result of his attorney's ineffective assistance.

First, Castronuovo argues that his statements were made as part of a plea agreement. Federal Rule of Criminal Procedure 11(f) provides that "[t]he admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410." Fed. R. Crim. P. 11(f). Federal Rule of Evidence 410, in turn, provides that a court cannot admit against a defendant "a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea." Fed. R. Evid. 410 (a)(4).

"To determine whether a discussion should be characterized as a plea negotiation, the trial court must determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances." United States v. Merrill, 685 F.3d 1002, 1013 (11th Cir. 2012) (citing United States v. Robertson, 582 F.2d 1356, 1366 (5th Cir. 1978)).

The denial of a motion to suppress presents a mixed question of fact and law. United States v. Delancy, 502 F.3d 1297, 1304 (11th Cir. 2007). We review the findings of fact for clear error and the interpretation and application of law de novo. Id. "[W]e may affirm the denial of a motion to suppress on any ground

24

supported by the record." United States v. Caraballo, 595 F.3d 1214, 1222 (11th Cir. 2010).

Here, the district court found that even if Castronuovo had a subjective expectation to negotiate a plea at the meetings with government agents, his expectation was objectively unreasonable. Before ruling on Castronuovo's motion to suppress, the district court held a hearing with Castronuovo, his former attorney, and the agents who were present during the discussions. After hearing testimony, the court determined that an expectation of plea negotiations was objectively unreasonable where no charges against Castronuovo were pending and no discussions of potential charges or immunity occurred before or during the meetings. The government was still gathering evidence and interviewing witnesses as part of an ongoing investigation when the discussions occurred. These factual findings were not clearly erroneous, and the court properly concluded that even if Castronuovo expected to negotiate a plea during the meetings, the expectation was not objectively reasonable. See, e.g., Merrill, 685 F.3d at 1013 ("There were no pending charges against [the defendant] when the discussion occurred, and the general discussions of leniency did not transform [the defendant]'s meeting with the prosecutor and federal agents into plea negotiations."). Therefore, the discussions should not have been characterized as a plea negotiation, and the district court properly denied Defendant's motion to suppress.

25

Second, Castronuovo argues that the district court erred in denying his motion to suppress because his attorney at the time, Michelle Suskauer, Esquire, was ineffective for failing to secure limited use immunity before the interview. We have held that "[e]xcept in the rare instance when the record is sufficiently developed, we will not address claims for ineffective assistance of counsel on direct appeal." United States v. Merrill, 513 F.3d 1293, 1308 (11th Cir. 2008) (alterations in original) (quoting United States v. Verbitskaya, 406 F.3d 1324, 1337 (11th Cir. 2005)). Instead, "[t]he better-reasoned approach is to permit ineffective-assistance claims to be brought in the first instance in a timely motion in the district court under [28 U.S.C.] § 2255," "even if the record contains some indication of deficiencies in counsel's performance." Massaro v. United States, 538 U.S. 500, 504 (2003). Here, although the district court held an evidentiary hearing in connection with Castronuovo's motion to suppress, the basis for Ms. Suskauer's recommendation that Castronuovo participate in the meetings and the actions taken by Ms. Suskauer to investigate the case against Castronuovo up to that point are not sufficiently developed. Thus, Castronuovo's ineffective assistance claim would be more appropriately addressed in a motion under 28 U.S.C. § 2255.

### D.    Prejudicial Joinder

Castronuovo next argues that the district court erred in denying his motion for relief from prejudicial joinder because he was irreparably prejudiced by the

26

jury hearing evidence against both Defendants in the same trial. But Castronuovo cannot demonstrate that the district court abused its discretion.

Generally, defendants who are indicted together are tried together unless the defendant seeking severance can show that a joint trial would prejudice his substantial rights and that "severance is the only proper remedy for that prejudice." United States v. Lopez, 649 F.3d 1222, 1234 (11th Cir. 2011); see Fed. R. Crim. P. 14(a) (stating that "the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires" where the joinder of offenses or defendants "appears to prejudice a defendant or the government"). And we have expressed our "reluctan[ce] to reverse a district court's denial of severance, particularly in conspiracy cases." United States v. Knowles, 66 F.3d 1146, 1158 (11th Cir. 1995).

In deciding a severance motion, a district court must balance the right of the defendant to a fair trial against the public's interest in efficient and economic administration of justice. United States v. Alvarez, 755 F.2d 830, 857 (11th Cir. 1985). Severance is granted only when the defendant can demonstrate that a joint trial will result in "specific and compelling prejudice" to his defense, id. (quoting United States v. Zielie, 734 F.2d 1447, 1464 (11th Cir. 1984)), resulting in "fundamental unfairness." Knowles, 66 F.3d at 1159.

27

There are four instances of prejudicial joinder that will generally require severance: where (1) "the [d]efendants rely on mutually antagonistic defenses"; (2) "one [d]efendant would exculpate the moving [d]efendant in a separate trial, but will not testify in a joint setting"; (3) "inculpatory evidence will be admitted against one [d]efendant that is not admissible against the other"; and (4) "a cumulative and prejudicial 'spill over' effect may prevent the jury from sifting through the evidence to make an individualized determination as to each [d]efendant." United States v. Chavez, 584 F.3d 1354, 1360–61 (11th Cir. 2009). Demonstrating one of these four instances is a "heavy burden." Kennard, 472 F.3d at 858–59.

Here, Defendants were jointly indicted for the same conspiracy based on their acts at sister clinics. Defendants did not rely on mutually antagonistic defenses, and neither Defendant contends that he or she would have testified against the other in the event of separate trials. There is no indication that the government intended to use inculpatory evidence that was admissible against Cadet but not admissible against Castronuovo. And Castronuovo did not identify any cumulative or prejudicial spillover effect that would have prevented the jury from sifting through the evidence to make an individualized determination as to each Defendant.

28

Moreover, the district court instructed the jury to consider the case of each defendant separately and individually. See Kennard, 472 F.3d at 859 (explaining that "the potential 'spillover effect' of evidence of a co-defendant's guilt" is generally "mitigate[d]" by "a court's cautionary instructions"). Thus, because a joint trial did not prejudice Castronuovo, the district court did not abuse its discretion in denying his severance motion.

### E.    Allen Charge

Castronuovo's final argument on appeal is that the district court improperly coerced the jury by effectively delivering two modified Allen charges. "An 'Allen charge' is a trial court's admonition to a deadlocked jury, instructing it to make further attempts to reach a verdict." United States v. Polar, 369 F.3d 1248, 1254 (11th Cir. 2004). A district court abuses its discretion by giving an Allen charge only if it was "inherently coercive." Woodard, 531 F.3d at 1364. To determine whether the charge was inherently coercive, we consider the language used and the totality of the circumstances surrounding the charge, including whether the district court polled the jury before giving the charge and the amount of time that elapsed between the charge and the verdict's return. Id.

There was no sign of coercion here. The district court had not polled the jurors before issuing the Allen charge, and the 2 to 2 ½ hours that elapsed between the charge and the returned verdict does not suggest coercion. See United States v.

29

Chigbo, 38 F.3d 543, 546 (11th Cir. 1994) (concluding after the jury returned a verdict within fifteen minutes of delivery of the charge that "[t]he speed with which the jury returned its verdict after receiving the modified Allen charge does not change our decision"); see also United States v. Jones, 518 F. App'x 741, 743 (11th Cir. 2013) (nonprecedential) (Allen charge not coercive where jury returned a verdict roughly thirty minutes later); United States v. Miller, 451 F. App'x 896, 898 (11th Cir. 2012) (nonprecedential) (Allen charge not coercive where jury returned a verdict about eight minutes later). Moreover, the district court's charge was based on language from the Eleventh Circuit Pattern Jury Instruction for deadlocked juries, which we have held to be non-coercive. United States v. Trujillo, 146 F.3d 838, 846–47 (11th Cir. 1998).

Castronuovo nevertheless argues that the circumstances surrounding the charge were unduly coercive because the district court's directions to completely fill out the verdict form constituted the "first," constructive Allen charge, followed by a "second," official Allen charge when the jury reported that it was deadlocked. But this argument holds no water.

In giving an Allen charge, the district court instructs a deadlocked jury to undertake further efforts to reach a verdict. Polar, 369 F.3d at 1254. Here, the jury had not indicated that it was deadlocked when the court instructed the jury to fill out the blank portions of the verdict sheet. Rather, the jury sent a note indicating

they <u>had</u> reached a verdict before it submitted the incomplete verdict forms. Thus, the district court's subsequent instruction to fill out the form completely was not a "constructive" <u>Allen</u> charge. Instead, the district court gave a single modified <u>Allen</u> charge after the jury stated that it was deadlocked, which was proper. Because no facts indicate that the <u>Allen</u> charge was inherently coercive, the district court did not abuse its discretion by issuing it.

### F.    Cumulative Prejudicial Effect

Cadet further argues that she should be granted a new trial based on the cumulative error doctrine. Although Cadet suggests that any one of the alleged errors is sufficient to warrant a new trial, Cadet argues that their combined effect rendered her trial fundamentally unfair.

Under the cumulative error doctrine, the "cumulative prejudicial effect of many errors may be greater than the sum of the prejudice caused by each individual error" in a manner that denies a defendant of a fair trial. <u>United States v. Baker</u>, 432 F.3d 1189, 1223 (11th Cir. 2005), <u>abrogated on other grounds by</u> <u>Davis v. Washington</u>, 547 U.S. 813, 821 (2006). "We address claims of cumulative error by first considering the validity of each claim individually, and then examining any errors that we find in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." <u>Morris v. Sec'y, Dep't of Corr.</u>, 677 F.3d 1117, 1132 (11th Cir. 2012). We will reverse a conviction

31

only if the defendant can show that the aggregate of nonreversible errors affected his substantial rights. United States v. Capers, 708 F.3d 1286, 1299 (11th Cir. 2013).

### 1.    Constructive amendment of the indictment

Cadet[4] first contends that the district court constructively amended the indictment by giving a jury instruction that altered the specified unlawful activity underlying the money laundering conspiracy count. A constructive amendment occurs when "the prosecutor's actions or the court's instructions, 'viewed in context,' resulted in the expansion of an indictment either literally or in effect." United States v. Behety, 32 F.3d 503, 508–09 (11th Cir. 1994) (quoting United States v. Andrews, 850 F.2d 1557, 1559 (11th Cir. 1988) (en banc)). The "essential elements of an indictment are impermissibly broadened when an indictment includes language describing the statutory crime and additional language narrowing the charged crime to a subset of the statutory crime, but the jury instruction omits the narrowing language." United States v. Moore, 525 F.3d 1033, 1045 (11th Cir. 2008) (citing United States v. Narog, 372 F.3d 1243, 1248 (11th Cir. 2004)).

The statutory offense for a § 1957(a) money laundering conspiracy requires that a defendant "knowingly engage[] or attempt[] to engage in a monetary

---

[4]    Castronuovo adopts this argument.

32

transaction in criminally derived property of a value greater than $10,000" that "is derived from specified unlawful activity." 18 U.S.C. § 1957(a). The second superseding indictment included language narrowing the charged crime by stating that "the specified unlawful activity is the distribution, dispensing and possession with intent to distribute and dispense[] oxycodone, a Schedule II narcotic controlled substance" that was "outside the scope of professional practice and not for a legitimate medical purpose."

But the jury instructions did not include the indictment's narrowing language. The instructions did not specify that the distribution must be "outside the scope of professional practice and not for a legitimate purpose" and that the controlled substance must be "Oxycodone." They stated only that the criminal source of the proceeds must be the "felonious" distribution of a "controlled substance." By omitting the narrowing language, the instruction constructively amended the indictment. Narog, 372 F.3d at 1248.

A jury instruction that constructively amends an indictment constitutes reversible error per se if the defendant objected to the jury instruction before the jury retired to deliberate. Madden, 733 F.3d at 1321 n.5. Cadet argues that she preserved the issue in a post-trial motion to vacate her conviction wherein she stated that the district court "deliberate[ly]" omitted the language "due to Defense counsels' specific requests to mirror the definition from the Indictment." But Cadet

did not object to the instruction before the jury retired to deliberate, so the constructive amendment is not reversible error per se.

Instead, we review the district court's instruction for plain error. Gutierrez, 745 F.3d at 471; Madden, 733 F.3d at 1321 n.5. Reversal is warranted only if the constructive amendment (1) was plain, (2) affected Defendants' substantial rights, and (3) seriously affected the fairness, integrity, and public reputation of judicial proceedings. United States v. Romano, 314 F.3d 1279, 1281–82 (11th Cir. 2002).

Here, even though the jury instruction constructively amended the indictment, the constructive amendment did not affect Defendants' substantial rights because the indictment's substance remained intact. See Moore, 525 F.3d at 1046. The district court instructed the jury that Defendants were charged in Count 1 with a conspiracy to "to distribute, dispense or possess with intent to distribute or dispense Oxycodone without authorization by law" and that "Section 841(a)(1) makes it a crime for anyone to knowingly distribute, dispense or possess with the intent to distribute or dispense Oxycodone." Only Counts 3 and 4, relating to the drug-related patient deaths, mentioned another controlled substance (i.e., Alprazolam, which is also known as Xanax). Evidence at trial focused on Oxycodone as well. See United States v. Cromartie, 267 F.3d 1293, 1296–97 (11th Cir. 2001) (failure to submit required element to jury was not reversible plain error because the jury "necessarily" relied on "[t]he only evidence" at issue establishing

34

the requisite element). And while the district court's instructions referred to Oxycodone on eight separate occasions, Alprazolam was mentioned just once.

The district court also instructed the jury that for Counts 3 through 11 the government must prove beyond a reasonable doubt that "[t]he Defendant distributed or dispensed, or possessed with intent to distribute or dispense, not for a legitimate medical purpose or outside the usual course of professional practice, the controlled substance as charged." The court even reminded the jurors that "[a]gain, Defendants are charged with knowingly and willfully prescribing controlled substances to his or her patients outside the usual course of professional medical practice." Moreover, based on the evidence presented at trial and because Defendants were physicians with dispensing licenses, the only way that the "buying, selling, and otherwise dealing in a controlled substance" at the clinics could have been "felonious" for the purposes of Defendants' conviction was if those actions were taken "outside the scope of professional practice and not for a legitimate purpose."

So although the instructions for Count 13 did not specify the controlled substance or restate how the distribution was "felonious," no rational jury would have convicted Defendants for money laundering conspiracy without considering the proceeds to be derived from Oxycodone that was dispensed "outside the scope of professional practice." Thus, in light of the instructions as a whole and the

35

evidence shown at trial, Defendants' substantial rights were not affected by the instruction, and a new trial is not warranted.

## 2.    Guilt by association

As to the second error alleged in her cumulative error argument, Cadet[5] contends that the prosecutor's theory of guilt by association prejudiced her rights. During opening statements, the prosecutor repeatedly referred to the "criminal doctors" as a collective. The prosecutor stated that the jury would know Cadet's guilt when other doctors "come in in their prison jumpsuit[s]" and tell the jury "what they did." And the prosecutor referred to the witnesses' "prison jumpsuits" on at least two other occasions. He further stated that these witnesses would "say they saw the same patients as Defendant Cadet and Defendant Castronuovo, and when they wrote those prescriptions, those criminal doctors, they were criminals, they were drug dealers, they did it without a medical purpose and it was outside the scope of their practice." The prosecutor concluded that these were "the same prescriptions written by Cadet and Castronuovo." Defendants generally objected to these statements.

Also, during closing argument, the prosecutor continually referred to the other doctors appearing "in handcuffs and leg irons." The prosecutor posed the following hypothetical to the jury: "So how can Dr. Cadet reasonably distinguish

---

[5]    Castronuovo adopts this argument.

36

herself and her practices from those of Drs. Aruta, Boshers, and Dreszer?" The

prosecutor suggested that "the answer is she can't." Defendants did not object to

the prosecutor's closing argument.

We review a claim of prosecutorial misconduct de novo. United States v.

House, 684 F.3d 1173, 1197 (11th Cir. 2012). But where the defendant does not

object to the propriety of the prosecutor's statement, we review for plain error

only. Flanders, 752 F.3d at 1332–33. Under plain error review, "the defendant

must show that (1) an error occurred; (2) the error was plain; (3) it affected his

substantial rights; and (4) it seriously affected the fairness of the judicial

proceedings." Id.

Here, under either standard, the prosecutor's comments do not warrant a new

trial. It is well understood that "[o]ne person's guilty plea or conviction may not be

used as substantive evidence of the guilt of another." United States v. King, 505

F.2d 602, 607 (5th Cir. 1974).[6] But the prosecutor may comment on the evidence

presented to the jury when describing the close association between

co-conspirators. See United States v. Castro, 89 F.3d 1443, 1457 (11th Cir. 1996)

(describing the appellants' guilt-by-association argument as "meritless" because

"the prosecutor properly commented on the evidence presented to the jury when he

---

[6]    In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court
adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to
October 1, 1981.

described the close association that appellants shared with others involved in the kickback scheme prior to and during their criminal activities"); United States v. Tisdale, 817 F.2d 1552, 1555 (11th Cir. 1987) (explaining that no error occurs when the evidence supports a prosecutor's comments). And the prosecutor may "blunt the impact of 'expected attacks on witnesses' credibility'" by "disclos[ing] guilty pleas of Government witnesses." United States v. DeLoach, 34 F.3d 1001, 1004 (11th Cir. 1994) (quoting United States v. Countryman, 758 F.2d 574, 577 (11th Cir. 1985)). There was no reversible error when the prosecutor commented on witnesses appearing in their "prison jumpsuits," a fact observable by the jurors themselves. See, e.g., United States v. Adams, 1 F.3d 1566, 1584 (11th Cir. 1993).

Moreover, the district court's curative instructions mitigated the impact of the prosecutor's comments. The district court told the jury to consider the testimony of pleading witnesses "with more caution" and stated that those witnesses may "hope to gain more favorable treatment." The district court also explained that "the fact that a witness has pleaded guilty to an offense isn't evidence of the guilt of any other person," and it reminded the jury that "anything the lawyers say is not evidence." These cautionary instructions "sufficiently cure any potential for prejudice to the defendant on trial." United States v. Carrazana, 921 F.2d 1557, 1568 (11th Cir. 1991). As such, the prosecutor's comments do not warrant a new trial.

38

### 3.    Cross-examination

Cadet next challenges the district court's limitation on cross-examination of Chris George about his tattoo of a Nazi symbol, a picture in which he saluted a Nazi flag, and his use of the "N word." Cadet argues that the district court abused its discretion in limiting cross-examination pursuant to Federal Rule of Evidence 403 and that this limitation violated Cadet's Confrontation Clause rights under the Sixth Amendment.

First, under Rule 403, the district court may exclude otherwise relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. When reviewing a district court's Rule 403 evidentiary ruling, "we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." United States v. Brown, 441 F.3d 1330, 1362 (11th Cir. 2006).

Here, the district court determined that the evidence had minimal probative value as to bias because the record indicated that George had a good relationship with Cadet, untainted by racial bias. The minimal probative value was substantially outweighed by the unfair prejudice that would result from its use. Cadet, therefore, has not shown that the district court abused its discretion.

Moreover, Cadet has not shown that the district court's decision impeded her ability to otherwise effectively cross-examine George. Cadet extensively cross-

examined George about the ways in which he surreptitiously operated the clinics and kept Cadet shielded from certain aspects of the clinics' scheme. Cadet also asked George about his plea agreement with the government, which required him to testify if called upon. There was ample evidence upon which Cadet could and did argue that George's testimony was unreliable and upon which the jury could evaluate George's credibility.

Second, the limitation on cross-examination did not violate Cadet's Sixth Amendment rights. A defendant "is entitled only to an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defendant might wish." Maxwell, 579 F.3d at 1296 (quoting United States v. Baptista-Rodriguez, 17 F.3d 1354, 1366 (11th Cir. 1994)). District courts "retain wide latitude" to reasonably limit "cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). "The test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of a witness' credibility had counsel pursued the proposed line of cross-examination." United States v. Garcia, 13 F.3d 1464, 1469 (11th Cir. 1994).

40

Under these circumstances, we cannot say that a reasonable jury would have received a significantly different impression of George's credibility had the district court allowed the proposed line of questioning. Although the importance of cross-examining George was heightened because he spearheaded the clinics' operations, Defendants' counsel had ample opportunity to raise doubts about George's credibility and did so. Permitting cross-examination about his tattoo, photo, and racial slurs would not have provided a significantly different impression of his credibility. Thus, the Confrontation Clause was satisfied, and the district court did not abuse its discretion in limiting cross-examination.

### 4.    Good faith defense

Finally, Cadet argues that the district court erroneously instructed the jury that a good faith defense applies to the substantive drug conspiracy count, but not the money laundering conspiracy count. Yet Cadet requested a good faith instruction only for the drug conspiracy count. And she did not otherwise object to the instruction's absence during the charge conference. Thus, we review for plain error the district court's failure to give the good faith instruction as to the money laundering conspiracy count. Pena, 684 F.3d at 1151.

"Under the plain error standard, an appellant must show that: (1) an error occurred; (2) the error was plain; (3) it affected his substantial rights; and (4) it seriously affected the fairness of the judicial proceedings." Id. The defendant

"bears the burden of persuasion" as to the third prong and "must show that the claimed error affected his substantial rights, which almost always requires that the error must have affected the outcome of the district court proceedings." Id. (quoting United States v. Pantle, 637 F.3d 1172, 1177 (11th Cir. 2011) (per curiam)). Where the instructions "adequately informed the jury's good faith analysis," there is "no reversible error leaving a substantial, ineradicable doubt as to whether the court's instructions properly guided the jury's deliberations." Dohan, 508 F.3d at 993.

Here, the district court instructed the jury that it must find, inter alia, that (1) Defendants "knew the transaction involved property or funds that were the proceeds of some criminal activity"; (2) "the individual Defendant knew that the property involved in the monetary transaction was obtained or derived from committing some crime"; and (3) "the individual Defendant knew about the plan's unlawful purpose and willfully joined in it." These instructions required the jury to rule out the possibility that Cadet actually harbored a good faith belief in the legitimacy of the clinics' business before it could have found that she knew that the money represented criminally derived proceeds. Thus, because the charges as a whole adequately informed the jury's good faith analysis, the district court did not commit reversible error.

42

Consequently, Cadet has not presented any individually reversible error, so no cumulative prejudicial effect warrants a new trial.

## IV. CONCLUSION

We **AFFIRM** Defendants' judgments of conviction.